[No. D007124. Fourth Dist., Div. One. Apr. 21, 1989.]

VESSEY & COMPANY, INC., Petitioner, v.
AGRICULTURAL LABOR RELATIONS BOARD, Respondent;
UNITED FARM WORKERS OF AMERICA, AFL-CIO, Real Party
in Interest.

[No. D007175. Fourth Dist., Div. One. Apr. 21, 1989.]

CARL MAGGIO, Petitioner, v.
AGRICULTURAL LABOR RELATIONS BOARD, Respondent;
UNITED FARM WORKERS OF AMERICA, AFL-CIO, Real Party
in Interest.

**[Opinion certified for partial publication.[1]]**

---

[1] Pursuant to California Rules of Court, rules 976.1 and 976(b), this opinion is certified for publication with the exception of sections IV A., IV B., IV B. 1., IV B. 2., IV E. 3., and IV F.

COUNSEL

Littler, Mendelson, Fastiff & Tichy, Scott A. Wilson and Theodore R. Scott for Petitioner Vessey.

Gray, Cary, Ames & Frye, Merrill F. Storms, Jr., and John A. Finley for Petitioner Maggio.

Dave Stirling, Michael D. Stump, Bernard L. Allamano and Kevin S. Robinson for Respondent.

Dianna Lyons for Real Party in Interest.

OPINION

HUFFMAN, J.—Vessey & Company, Inc. (Vessey) and Carl Maggio, dba Maggio Farms (Maggio), petition this court under Labor Code section 1160.8[2] for review of Agricultural Labor Relations Board (ALRB or Board) decision 13 ALRB No. 17, which determined Vessey and Maggio, separately and collectively, engaged in lawful bargaining with the United Farm Workers of America (UFW) but violated sections 1153 (a) and (c); Maggio failed to treat, with the exception of its tractor drivers and irrigators, the returning strikers' offers to return to work in a nondiscriminatory fashion

---

[2] All statutory references are to the Labor Code unless otherwise specified. When referring to statutory subparts we omit repetition of the word "subdivision."

and Vessey failed to establish "legitimate and substantial business just-ifications" for not immediately reinstating certain returning economic strik-ers classified as tractor drivers, irrigators and sprinklers.

Maggio also seeks review of Board decision 13 ALRB No. 22, which modifies 13 ALRB No. 17, by clarifying the remedy against Maggio after finding Maggio hired permanent replacements before receipt of the strikers' unconditional offers to return to work.

As part of the decisions and pursuant to section 1160.3, the Board or-dered Vessey to cease and desist from its unlawful rehiring practices, offer full and immediate reinstatement to certain listed strikers without prejudice of seniority and other employment rights, reimburse those strikers for back pay and other economic losses plus interest, mail and post the customary "notice" stating the findings against Vessey and the strikers' rights, and keep the regional director apprised of steps taken to comply with the order until full compliance is achieved.

As to Maggio, the Board issued the same cease and desist, "notice", and appraisal orders, and limited Maggio's requirement to reinstate strikers and reimburse them for back pay and other economic losses to those workers who were deprived of reinstatement after tendering their unconditional offers solely due to Maggio's altered, discriminatory seniority system.

Vessey and Maggio generally contend the Board's findings and ordered remedies are not supported by substantial evidence, applicable law, and violate the United States and California Constitutions. Vessey specifically argues the Board's decision violates due process because the Administrative Law Judge (ALJ) allowed the ALRB to amend its complaint to allege Vessey's employees were "economic strikers" after the case was closed and Vessey had no time to address the new alternative charge, the decision is unsupported by sufficient evidence to show the strikers made a sincere and unconditional offer to return to work and Vessey had not permanently replaced the strikers before they offered to return to work, and it unlawfully reversed the ALJ's finding Vessey lawfully refused to offer immediate rein-statement to its tractor drivers and irrigators. Maggio merely challenges the sufficiency of the evidence to support the decisions.

To set the scene for our discussion of the specific arguments of Vessey and Maggio, we briefly sketch the procedural and factual background, our standard of review, and set out the evidence in the record at length.

I

PROCEDURAL AND FACTUAL BACKGROUND

Sometime before 1977, both Vessey and Maggio, agricultural employers in Imperial County subject to provisions of the Agricultural Labor Relations Act (Act) (§ 1140 et seq.), had negotiated labor contracts with the Teamsters Union. Thereafter, the UFW was certified as the new bargaining representative for the workers and separate contracts with each employer were entered into in 1977, to run through December 31, 1978.

Before the end of that period, a new industry-wide bargaining group of approximately 26 growers in the Salinas and Imperial Valley areas was set up to negotiate a new agreement with the union. Because of ongoing bargaining, Vessey's and Maggio's contracts were extended to January 15, 1979. When no new agreement was reached before the contract expired, the UFW initiated strikes on January 19 and 20, 1979. Then, on February 28, 1979, the group of employers, which included Vessey and Maggio, declared an impasse and broke off negotiations. (See *Joe Maggio, Inc., et al.* (Oct. 7, 1982) 8 ALRB No. 72, pp. 3-4 (*Maggio I*).)

Collective bargaining continued off and on throughout the next few years. The UFW filed separate charges alleging bad faith bargaining and unlawful rehiring practices for various times during 1979 through 1981 by Vessey and Maggio, respectively. These complaints were heard separately by ALJs and then reviewed by the ALRB.

Based on earlier bargaining conduct for different complaint periods than those involved in this case, the Board found both Vessey and Maggio failed to bargain in good faith. (*Admiral Packing Company, et al.* (Dec. 14, 1981) 7 ALRB No. 43 (*Admiral*) and *Maggio I, supra,* 8 ALRB No. 72.) This court consolidated petitions for review in *Admiral* and *Vessey & Company, Inc.* (Dec. 15, 1981) 7 ALRB No. 44 (*Vessey I*), a case adopting *Admiral*'s classification of the ongoing strike as an unfair labor practice (ULP) strike and determining Vessey unlawfully refused to reinstate returning strikers after their unconditional offers to return to work were received by Vessey December 4, 1979.

In *Carl Joseph Maggio, Inc.* v. *Agricultural Labor Relations Bd.* (1984) 154 Cal.App.3d 40, 72 [201 Cal.Rptr. 30] (*Carl Maggio*), we determined the Board's finding of bad faith bargaining for the period between February 28, 1979, through August 8, 1979, was unsupported by the record, reversed

Admiral and remanded *Vessey I* to the Board for reconsideration in light of *Carl Maggio*.

The Board subsequently determined the reinstatement rights of Vessey's striking lettuce and weed and thin workers were violated because Vessey had failed to show it had hired permanent replacements for them. (*Vessey & Company, Inc.* (Feb. 28, 1985) 11 ALRB No. 3, pp. 3-5 (*Vessey II*).)

Meanwhile, *Maggio I* was also remanded to the Board for reconsideration in light of *Carl Maggio* with the resultant finding there was no bad faith bargaining by Vessey or Maggio between February 21 and December 31, 1979. (*Joe Maggio, Inc., et al.* (Dec. 23, 1985) 11 ALRB No. 35 (*Maggio II*).)

At this same time, the complaints here against Vessey and Maggio for the period of late December 1979 through March 1981 were proceeding through the administrative review process. They were consolidated for hearing, along with complaints against two other agricultural employers, Colace Brothers, Inc. and Martori Brothers Distributors, and heard by an ALJ at various dates throughout 1981 and 1982. The consolidated complaint was amended four times. Because Colace was granted a prehearing severance motion to proceed separately, and Martori does not petition for review, we do not concern ourselves with the charges against them.

The fourth amended complaint filed April 24, 1981, raised four main areas of violation: (1) it charged Vessey and Maggio with bad faith bargaining from December 7, 1979, to the present; (2) it charged both with partial or total shutdown of operations in Imperial Valley without bargaining with the union about the decision to shut down and its effect in order to avoid their obligation to bargain in good faith and in order to discriminate against their seniority lettuce workers for their union activities; (3) it charged Vessey with illegally subcontracting or transferring bargaining unit work to its alter ego and/or its joint employer, Cortaro Farms in Arizona, in order to avoid good faith bargaining and to discriminate against its seniority lettuce workers; and (4) it charged Vessey and Maggio with failing and refusing to rehire unfair labor practice strikers or, in the alternative, as to Maggio, economic strikers, who unconditionally offered to return to work.

The complaint was amended again, January 12, 1982, to allege, in the alternative, Vessey's workers were economic strikers.

After hearing, the ALJ issued its decision on February 7, 1983, finding Vessey and Maggio had continued in the ongoing bad faith negotiations

found in *Admiral* and *Maggio I* and had failed and refused to reinstate unfair labor practice strikers who had made unconditional offers to return to work. The ALJ, however, found the shutdowns lawful and that general counsel for the ALRB had not proved its charge against Vessey on its alter ego and/or joint employer theories and there was no jurisdiction to hear the charge.

The parties excepted to the ALJ's findings and decision. The Board, now aware of the fact the ALJ relied on *Admiral* and *Maggio I* which had been remanded for redetermination, asked the parties to file supplemental briefs regarding the effect of *Carl Maggio* on the present charges. On October 23, 1987, the Board determined Vessey and Maggio had engaged in lawful bargaining but violated the Act by failing to treat the returning strikers' offers to return to work in a nondiscriminatory fashion. In making its determination, the Board rejected the ALJ's findings regarding collective bargaining, adopted the ALJ's findings concerning closure of operations and alter ego/joint employer allegations, and modified and adopted an alternative analysis of the rights of the returning strikers.

Vessey petitioned for review of this decision November 12, 1987. Maggio asked the Board to reconsider or clarify its decision and order, and filed its petition for review here November 20, 1987. The Board denied Maggio's motion for reconsideration or clarification December 2, 1987, but redrafted its order, finding Maggio's replacement workers were permanent but Maggio so altered its rehiring and seniority policy as to discriminate against the returning strikers. The certified record for both determinations was filed December 15, 1987, and we consolidated the cases for our review, December 24, 1987.

In January 1988 a briefing schedule for the cases was established. Vessey belatedly filed a motion for reconsideration with the Board March 4, 1988, which was denied. A series of extensions, motions, and supplemental briefs followed. As a result of the motions, we have taken judicial notice of the decisions in *Vessey I* and *II,* our unpublished opinion *Vessey & Company, Inc.* v. *Agricultural Labor Relations Board et al.* (Apr. 4, 1986) D002914, which reviews *Vessey I* and *II,* and the statement of decision regarding liability and corresponding memorandum of decision on bifurcated issues in Maggio, Inc. v. UFW (Super. Ct. Imperial County, 1986, No. 51761), which is now pending before this court in a separate appeal (*Maggio Inc.* v. *United Farm Workers of America* (D006453, app. pending).

## II

### Standards of Review

We must review the Board decision to determine whether its findings are supported by substantial evidence. (§ 1160.8; *Tex-Cal Land Management, Inc.* v. *Agricultural Labor Relations Bd.* (1979) 24 Cal.3d 335, 343 [156 Cal.Rptr. 1, 595 P.2d 579]; *Carl Maggio, supra,* 154 Cal.App.3d at pp. 54-55.) ■ Its findings as to questions of fact are conclusive if supported by substantial evidence on the record considered as a whole. (*Martori Brothers Distributors* v. *Agricultural Labor Relations Bd.* (1981) 29 Cal.3d 721, 727 [175 Cal.Rptr. 626, 631 P.2d 60].) " 'Of course, we do not reweigh the evidence. If there is a plausible basis for the Board's factual decisions, we are not concerned that contrary findings may seem to us equally reasonable, or even more so.' (Citation omitted.) (*Rivcom [Corp.* v. *Agricultural Labor Relations Bd.* (1983)] 34 Cal.3d [743] at pp. 756-757 [195 Cal.Rptr. 651, 670 P.2d 305].) Furthermore, those findings and conclusions that are within the Board's realm of expertise are entitled to special deference. [Citation.] And, because the evaluation of witnesses' credibility is a matter particularly for the trier of fact, the Board's findings based on the credibility of witnesses will not be disturbed unless the testimony is 'incredible or inherently improbable.' [Citations.]" (*Harry Carian Sales* v. *Agricultural Labor Relations Bd.* (1985) 39 Cal.3d 209, 220 [216 Cal.Rptr. 688, 703 P.2d 27].)

■ "Substantial evidence" is not established by just "any evidence" (*Sunnyside Nurseries, Inc.* v. *Agricultural Labor Relations Bd.* (1979) 93 Cal.App.3d 922, 930-931 [156 Cal.Rptr. 152]) and is not shown by mere suspicions of unlawful motivation (*Lozano Enterprises* v. *N.L.R.B.* (9th Cir. 1966) 357 F.2d 500, 503). The burden of proving unlawful conduct is on the ALRB (*Rivcom Corp.* v. *Agricultural Labor Relations Bd., supra,* 34 Cal.3d at p. 757), and such conduct will not lightly be inferred (*N.L.R.B.* v. *Federal Pacific Electric Company* (5th Cir. 1971) 441 F.2d 765, 770). The standard of review is met, however, if there is relevant evidence in the record which a reasonable mind might accept in support of the findings. (*Kawano, Inc.* v. *Agricultural Labor Relations Bd.* (1980) 106 Cal.App.3d 937, 943 [165 Cal.Rptr. 492].)

Moreover, the substantial evidence standard is not modified when the Board and ALJ disagree; the ALJ findings are merely part of the record to be reviewed along with the other evidence. If the Board identifies evidence which supports its inference and such evidence is substantial when measured against the contrary ALJ findings as well as the opposing evidence, its

findings must be upheld. (*Abatti Farms, Inc.* v. *Agricultural Labor Relations Bd.* (1980) 107 Cal.App.3d 317, 336 [165 Cal.Rptr. 887].)

■ This court is also guided in its review of Board orders by decisions under the National Labor Relations Act (NLRA) (29 U.S.C. § 151 et seq.), on which the Act was modeled (§ 1148; see *Triple E Produce Corp.* v. *Agricultural Labor Relations Bd.* (1983) 35 Cal.3d 42, 48 [196 Cal.Rptr. 518, 671 P.2d 1260]).

■ In this regard, we are cautioned against a rubber stamp approach to our record review (*N.L.R.B.* v. *O. A. Fuller Super Markets, Inc.* (5th. Cir. 1967) 374 F.2d 197, 200) based on guidance from the United States Supreme Court in *Universal Camera Corp.* v. *Labor Bd.* (1951) 340 U.S. 474, 487-488 [95 L.Ed. 456, 467-468, 71 S.Ct. 456]: "Whether or not it was ever permissible for courts to determine the substantiality of evidence supporting a Labor Board decision merely on the basis of evidence which in and of itself justified it, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn, the new legislation definitively precludes such a theory of review and bars its practice. The substantiality of evidence must take into account whatever in the record fairly detracts from its weight. This is clearly the significance of the requirement in both statutes that courts consider the whole record. . . . [¶] To be sure, the requirement for canvassing 'the whole record' in order to ascertain substantiality does not furnish a calculus of value by which a reviewing court can assess the evidence. Nor was it intended to negative the function of the Labor Board as one of those agencies presumably equipped or informed by experience to deal with a specialized field of knowledge, whose findings within that field carry the authority of an expertness which courts do not possess and therefore must respect. Nor does it mean that even as to matters not requiring expertise a court may displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*. Congress has merely made it clear that a reviewing court is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view." Further, we must set aside Board decisions and orders which rest on "erroneous legal foundations." (*Labor Board* v. *Brown* (1965) 380 U.S. 278, 292 [13 L.Ed.2d 839, 849, 85 S.Ct. 980].)

As for the Board's remedial orders, "[we] must not enter the allowable area of the Board's discretion and must guard against the danger of sliding unconsciously from the narrow confines of law into the more spacious

domain of policy." (*Phelps Dodge Corp.* v. *Labor Board* (1941) 313 U.S. 177, 194 [85 L.Ed. 1271, 1283, 61 S.Ct. 845, 133 A.L.R. 1217].) ■ In general, the Board's order " 'should stand unless it can be shown that the order is a patent attempt to achieve ends other than those which can be fairly said to effectuate the policies of the Act.' [Citations.]" (*Carian* v. *Agricultural Labor Relations Bd.* (1984) 36 Cal.3d 654, 674 [205 Cal.Rptr. 657, 685 P.2d 701].)

With these standards in mind, we first review the record and then the arguments.

III

THE RECORD

Vessey and Maggio grow and harvest vegetables and other crops in the Imperial and Salinas Valleys. The UFW struck both companies in January 1979 and certain workers submitted offers to return to work in December 1979, and at various dates in 1980. We are concerned here with the events which took place after the UFW struck and before the offers were received as well as the events which took place after the offers were received concerning replacement workers for the strikers and rehiring policies for returning strikers. We approach the record separately for each employer.

*MAGGIO*

Maggio operates farms in Holtville (Imperial Valley) and King City. Carl Joseph Maggio (Carl) is the president of Maggio and responsible for its California operation. George C. Stergios is the secretary/treasurer of the company and responsible for the growing and harvesting of Imperial Valley crops and the hiring of foremen who in turn employ the workers. He also has limited duties in King City. Stergios reports directly to Carl.

Maggio harvests bunch carrots from December until mid-May in Imperial Valley and harvests carrots in King City from mid-May until December. It harvests broccoli only in Imperial Valley and the season lasts from mid-December through mid-February. The lettuce harvest season in Imperial Valley was mid- to late December through mid- to late March, the planting season was September 20 until the first week of November, and the King City lettuce harvest was from the last part of April or early May until the end of June with a second harvest beginning around the end of August until the middle of October.

In September 1979 and the spring of 1980, Maggio planted and harvested carrots, broccoli, alfalfa, wheat and fava beans in Imperial Valley.

Early during the 1979 UFW strike, Maggio put together permanent replacement crews for the striking bunch carrot and broccoli workers, the irrigators, lettuce workers, the weeders and thinners, the tractor drivers and the sprinklers. The carrot and broccoli workers were seasonal workers while the tractor drivers and irrigators worked consistently year-round.

Because the Board subsequently found Maggio's failure to rehire any of the irrigators, lettuce workers and tractor drivers lawful, Maggio does not petition in regard to these workers. We, therefore, further limit our review to the record concerning the carrot and broccoli workers, the weeders and thinners and the sprinklers.

Also, shortly after the strike began, in an effort to provide year-round employment to replacement and non-striking workers, Maggio offered steady work during the strike and made it easy for workers to switch from one classified group of workers to another. After hiring permanent replacements to work its harvests for the remainder of the 1978-1979 season, Maggio recalled those workers for the 1979-1980 season. They retained their original date of hire for seniority even though the strikers did not.

Once the strike began, Maggio also launched a new policy of hiring only workers who had previously worked for the company and were considered reliable and not likely to walk out. The policy gave priority recall to those employees who had worked the previous season in the classification for which employment was sought, followed by those employees who were then working or had worked during the previous season in any classification for Maggio, by the King City workers wanting jobs in Imperial Valley, by students who had previously worked on weekends, holidays or summer vacations for Maggio, to family members of workers, to anyone who had ever worked for Maggio before, and then to returning strikers and finally new hires.

Before the strike, Maggio considered those who had worked during the season and who were present on the final day of the season as seniority workers. Those who had worked the entire season had seniority over those who had only worked part of the season and the final day. Anyone who missed an entire season would lose seniority status and would be hired only after all seniority workers. Additionally, the collective bargaining agreement in existence before the strike began did not permit the transfer of workers from one job classification to another. Nor did it allow geographic

transfers without considering seniority. Rather seniority and preference would go to the person who had worked the longest with any particular crew.

Special rules applied to the carrot bunch workers hired by Maggio. Their work consisted of hand picking and gathering carrots into bunches for ultimate sale as fresh produce. The crews worked Imperial Valley and then some moved on to King City. Those who only harvested in King City did not lose seniority but had less seniority than those who worked both cities. Maggio encouraged the carrot crews to work at both Imperial Valley and King City and tried to assure virtual year-round employment if the workers desired.

Humberto Felix, the foreman of the Imperial Valley and King City carrot bunch harvest crew, testified at the hearing about the past six years in the carrot crew. He stated there were always enough positions on the crews for all seniority workers. While the numbers fluctuated, Maggio could employ anyone with seniority who showed up to work. Felix stated there was no set number of crew members necessary for the harvest; if 70 workers showed up that was acceptable and if 125 showed up for work they would all be put to work, although the work day would probably be shorter.

Stergios's testimony corroborated the numerically changing nature of the carrot crew. He said the workers drifted in and out of the carrot harvest throughout the season and he was not aware of any situation where more people applied for work in the carrot bunch harvest than were needed.

When the strike started in 1979, all carrot workers went on strike. Felix said one-third of the striking carrot workers returned before the end of the 1979 season and the company hired 60 new replacement workers. Sometime thereafter the remaining carrot workers requested to return.

Usually, 2 crews of about 22-24 workers harvested the broccoli. The broccoli harvest was done by hand, but if no crew was available the harvest was done by machine. When the workers went out on strike, Maggio used only one crew and hired workers from the carrot bunch crew, the weed and thin crew, and new people to harvest the broccoli. If not enough people showed up on any given work day, the hours of work would be extended or the orders reduced.

Weeders and thinners were seasonal employees who worked in the lettuce and broccoli crops in Imperial Valley controlling the weeds and cutting or thinning the crops. The 1979-1980 season ran from November until the end

of January or early February and the 1980-1981 season lasted from December-March. To help with the 1979-1980 season, Maggio hired new workers to replace the strikers and six strikers returned. When the season was over, Maggio switched the weed and thin crew to the carrot and broccoli harvests.

The sprinklers worked from August until January in the Imperial Valley and provided irrigation for the carrot, broccoli, lettuce and alfalfa crops. Before the strike, Maggio employed 25-30 sprinklers for the Imperial Valley season. After the strike, the sprinkler crew was decreased.

Part of that reduction occurred after the 1979 harvest when Maggio eliminated its lettuce crop, thereby reducing the number of employees needed for weeding and thinning and sprinkling. Maggio also was forced to use smaller crews in the carrot and broccoli harvests because of the strike and lack of replacements. Maggio discovered it could more efficiently work crews regular eight-hour days instead of larger crews for four to five hours a day.

Beginning in January 1980, the UFW sent lists to Maggio of strikers who were offering to return to work. On January 22, 1980, Maggio received a list of tractor drivers and irrigators willing to return to work. On March 24, 1980, lists of carrot, broccoli and lettuce workers, and weeders and thinners were received by Maggio. In April, May and November 1980, most of the remaining strikers submitted written petitions to Maggio offering to return to work.

Carl testified he was skeptical of the offers to return to work because he saw continued picketing by people who were on the lists and he had read about another company which had experienced intermittent work stoppages while the strike was ongoing. He also recalled similar stoppages by his own employees at periods before the strike. He acknowledged, however, he never had discussions with anyone from the UFW about his concerns there might be work stoppages if he hired back strikers from the petition list.

By letter, March 3, 1980, Maggio sought clarification from the UFW as to whether the offers were sincere and unconditional. A March 11, 1980, letter from the UFW provided some of the information Maggio requested and stated the offers were unconditional and the "strike against [Maggio] continues at this time." No further clarification was sought.

When Maggio received the offers to return to work, there were no available positions for any of the returning strikers at the company. Maggio

placed the strikers on a preferential hiring list and incorporated the names in its recall and hiring policy started after the strike began. While Carl said this process was implemented to protect seniority rights of returning strikers, he did not consider the strikers "reliable" and did not want to rehire them. Carl admitted he later instructed the foremen not to hire from the union list, but to fill any vacancies with the people who had worked for the company since the strike in any job classification and to contact the head office if they needed more workers than those on the recall lists.

He stated Maggio eventually rehired three irrigators, but did not recall any others, claiming no openings. The three irrigators were rehired because there were obvious openings and Maggio wanted to protect its legal position and see if the three would show up.

Stergios told Dave Edwards, the person in charge of all hiring for Maggio, there was a new policy of hiring workers who had previously worked for the company in some seasonal work to allow them to transfer to any other job classification so as to give them year-round work. He said this was done because many replacement workers had sought him out to confirm permanence as a Maggio employee with recall rights. He told Edwards to hire replacements and King City workers before returning strikers. Carl also advised Edwards to hire King City workers before the strikers.

At the beginning of the fall 1980 season, Maggio mailed recall notices to employees who had worked the carrot, broccoli, weeding and thinning, and sprinkler crews the year before, asking them to report to work for the current season. Recall letters were sent to the sprinkler crew in September 1980 and to the broccoli and carrot workers in November and December 1980.

According to the Imperial Valley payroll clerk, Esther Marie Angulo, a worker had to have worked the last day of the preceding season to be eligible for the recall list and no person not on this "seniority list" was to be sent a notice. She was instructed to put the strikers' names on a separate list and not to send recall notices to them because the other list would be sufficient.

In addition to the workers on Angulo's "seniority list," the 1979-1980 harvest replacement workers were hired as long as they had worked for Maggio at any time since the strike. Carl stated all positions were adequately filled by these groups. Thus, no notices were sent to the returning strikers for the Imperial Valley season starting in November 1980.

Generally, the crews had to wait for the first day of the season to see how many of the recalled employees would show up for the new season. If a large number of persons showed up, the crews expanded and worked fewer hours. The number of employees who would show up on any one day varied. The work crews were very casual. As of March 1980, the foremen were instructed to make do with the workers on hand and not to hire new people or returning strikers.

Felix stated he had a full carrot crew for the 1980-1981 Imperial Valley harvest season made up of replacements who were students or workers who missed much of the last season. All the replacements retained their original seniority date even though they did not finish the 1979-1980 season. The strikers who did return, however, were given new seniority dates and treated as if they were new hires. When vacancies in his crews opened, the positions were left open and the hours the remaining crews worked were increased or the carrot orders were decreased by Maggio. He did not remember being told to notify the head office if he did not have enough workers, nor was he aware of any offers to return to work in 1980. Edwards told Felix strikers were to be hired only after replacements and King City workers and to contact him before rehiring a striker. However, Felix was not given a list of the strikers for recall purposes.

Felix also testified that in the summer of 1980 new workers were hired for the first time in King City and he was also instructed for the first time to make a list of all workers there who were willing to come to Imperial Valley the next season to work. Because Carl wanted some idea of how many people would be starting the Imperial Valley season, Felix then turned the list in to Maggio's general office.

Payroll clerk Angulo testified this list was used to check the people who had worked in King City the preceding season. As the workers appeared for work, she would call the King City payroll office to verify their status.

Felix further testified many of the replacement workers hired for the 1979-1980 season did not return and, of those that did, many did not finish the 1980-1981 season. It was stipulated that several first-time workers in the King City crew in the summer of 1981 appeared on the Imperial Valley carrot bunch crew payroll for the 1981-1982 season even though they had never worked in Imperial Valley.

Concerning the broccoli workers, foreman Clifford L. Kirkpatrick stated the 1979-1980 harvest was completed using full crews about February 18, 1980. During the 1980-1981 harvest, however, he needed more broccoli

harvesters, but Maggio refused to reemploy those who had offered to return to work. Kirkpatrick had been instructed to first hire people from the recall list, then to hire those who had worked in broccoli before, and then to hire others from the bunch carrot crew and sprinkler crew. If there were still vacancies, and not enough people to fill them, Kirkpatrick was to leave the positions open. Both Stergios and Carl told him not to hire strikers. He was also told to tell those he hired they were permanent employees and they would be able to work year-round by going from the broccoli crew to the bunch carrot crew and back. Neither Kirkpatrick nor any other foreman testified he was given instructions to notify the head office if there were not enough workers for a crew.

Another broccoli foreman, Domingo de la Torre, stated he had to fill his crew with people who had seniority since the strike and whose names appeared on the company list. The list did not include any strikers' names. Maggio never informed him it had a list of strikers ready to return to work. He needed more people in his crews to get the work done.

Receiving immunity in exchange for his testimony at the hearing, de la Torre explained he had resorted to a fraudulent scheme in both the 1980-1981 and the 1981-1982 seasons in order to have a full crew whereby new hires took former replacements' names and social security numbers of those people who were on the approved Maggio recall lists. He hired nine new employees for the 1980-1981 season using this scheme. De la Torre believed he would be fired if he failed to fill his crew or if he filled his crew with returning strikers.

Testimony conflicts as to whether de la Torre's supervisors acquiesced in this scheme. One such worker hired in December 1980 testified Kirkpatrick told him he could not work at Maggio as he was not on the recall list. Two or three days later he was approached by de la Torre, hired, and changed his name. He worked daily in full view of Kirkpatrick, and Kirkpatrick said nothing to him. Another witness for the general counsel testified he only worked for Maggio during the 1979-1980 broccoli harvest, while the payroll records showed someone using the witness's name worked the 1980-1981 and 1981-1982 seasons.

Stergios denied knowing anything about this scheme before January 1982. At that time, Stergios, along with Angulo and Maggio's attorney visited two different fields to check the identification cards of the workers, to match them with the names on the payroll records. No one quit or was fired as a result of these investigations.

Antonio Osuna Gonzalez, foreman of the weed and thin crew, worked under Edwards for Maggio. He testified there was no weeding and thinning being done at the time of the strike and that he later hired for the November 1979-February 1980 season under instructions from Edwards to reduce the crew size. Before the strike he employed 40 weeders and thinners. He couldn't remember how many he hired for the 1979-1980 season, but in 1980-1981 Maggio employed 30-35 people to weed and thin. Except for seven or eight strikers who abandoned the strike to return to work, no other strikers were rehired. Edwards, however, did the hiring for the 1980-1981 season.

Nicolas N. Diaz, foreman of the sprinkler crew, said after the strike Maggio recalled the sprinklers but did not fill the vacancies for the recalled workers who didn't show up. Diaz opined there was less sprinkler work in 1980 than in 1979.

In April 1981 Maggio sent notices to seniority replacement employees and strikers to return to work for the King City carrot harvest. It also notified the UFW by letter that there were openings in the King City harvest and that workers who worked there the season beginning in May 1980 would be eligible to work in the Imperial Valley carrot harvest. Letters of May 1 and 15, 1980, reiterated Maggio's offers of employment and explained its recall policy for the Imperial Valley harvest. The offers lapsed without acceptance by June 5, 1981.

*VESSEY*

Jon Vessey (Jon) is the general manager of Vessey & Company. The company employs tractor drivers, irrigators, weeders and thinners, and sprinklers. Before the 1980-1981 season, Vessey also employed lettuce workers to harvest the lettuce it grew in Imperial Valley. Like Maggio, it has ceased growing and harvesting lettuce in Imperial Valley. Vessey currently grows carrots, broccoli, alfalfa, cotton, wheat, sugar beets, sudan and dehydrated onions.

In January 1979 Vessey's tractor drivers, irrigators, weeders and thinners, sprinklers, and lettuce workers went out on strike. The lettuce strikers, along with the weeders and thinners, have been the subject of earlier proceedings (See *Vessey I* and *II* and our unpublished opinion D002914.) The record here, therefore, only deals with the tractor drivers, irrigators and sprinklers.

At the hearing, Jon testified Vessey permanently replaced the strikers by February 1979 and had no openings at the time UFW offers to return to

work were received by the company in December 1979. According to Jon, he understood the replacements he hired were permanent employees. Consequently, when the company received the offers, there were no vacancies to be filled by the strikers. No foremen or employees testified as to any understanding about the replacements being permanent employees of Vessey.

Regarding openings, Jon stated Vessey filled four vacant positions (two tractor drivers and two irrigators) from the list of petitioning strikers in the fall of 1980, but there were no other openings for tractor drivers, irrigators, or sprinklers. He explained one reason for the lack of vacancies was tractor drivers and irrigators worked close to year-round; because the workers liked full, year-round work, there was virtually no turnover.

Jon also stated he was uncertain the offers Vessey received were sincere or unconditional because, from the beginning of the 1979-1980 lettuce harvest until April or May 1980, he was confronted with daily picketing on his way to work. He saw numerous people on the picket lines who had turned in their offers to return to work. He, therefore, contacted the UFW to attempt to accommodate the desires of the strikers truly wishing to return to work.

Thomas Nassif, Vessey's attorney, stated he was informed by the UFW the strike was continuing and the union would retain the prerogative to pull strikers off the job even after they were reinstated pursuant to the work offer. However, according to Jon, there was no trouble with the workers who did return while the strike was ongoing.

The parties stipulated that if Antonio Osuna, a returning striker and irrigator, were called to testify, he would state that after the strike began, the company required its irrigators to work more successive 24-hour shifts and to perform the work the weed and thin crew did instead of recalling those workers. Osuna, however, would not be able to testify he himself worked more back-to-back shifts than prestrike or be able to say how much weed and thin work per week was done now as compared to prestrike.

It was also stipulated that if irrigator foreman Frank Villegas were called to testify, he would say working back-to-back longer shifts was voluntary and not mandatory.

Jon again testified. He said it was possible there were more poststrike back-to-back, 24-hour shifts required by reduced crews than prestrike. This was necessitated by the disruption in cropping schedules created by ceasing lettuce growing and harvesting. Moreover, after consulting with Villegas

about whether more irrigators were needed, Jon concluded more were not needed because the increased work was only temporary due to rerouting of water caused by the discontinuance of growing lettuce.

Jon also stated going out of the lettuce business enabled Vessey to go without the weed and thin crew because the vegetable acreage left after the lettuce cessation was only 100 acres of 1200 acres and the irrigators had historically been cross-trained to do some of the weed and thin work. He also stopped providing bus transportation for his workers.

Testimony showed Juan Lucero, a replacement tractor driver with Vessey, was laid off twice in 1981 by the company and then he left for a better job. His vacant position was not filled.

IV

DISCUSSION

To reiterate, Vessey and Maggio petition for review of the Board's decision and order, contending substantial evidence in the whole record does not support the Board's findings and ordered remedies, and such are not properly based on applicable law or the United States and California Constitutions. We deal with each specific contention in turn.

A., B., B.1, B.2*

. . . . . . . . . . . . . . . . . . . . . . . .

C. PERMANENT REPLACEMENTS

■ Vessey next takes exception to the Board's finding it had not permanently replaced any of the strikers before it received the strikers' offers to return to work. It contends the finding is contrary to applicable law and all the evidence in the record; no evidence contradicts Jon's testimony the replacements were permanent, the Board was split on the issue with one member agreeing the replacements were permanent, and the ALJ's finding the tractor drivers and irrigators were permanent must be considered in analyzing whether substantial evidence supports the Board's finding on this issue. Vessey thus contends substantial evidence does not support the

* See footnote, *ante,* page 629.

finding it did not permanently replace the strikers before receiving their offers to return to work. We disagree.

Federal law under the NLRA has extensively reviewed the problem of reinstatement rights of striking workers. ■ Strikers retain their status as employees unless they have obtained regular and substantially equivalent employment and, at the conclusion of the strike or upon offering to return to work, they have presumptive entitlement to their jobs with all attendant rights. (*NLRB* v. *Fleetwood Trailer Co.* [1967] 389 U.S. 375, 378 [19 L.Ed.2d 614, 617, 88 S.Ct. 543].) This entitlement to be reinstated in their jobs, however, depends on the nature of the strike and whether an employer who refuses to reinstate strikers can show "legitimate and substantial business justifications" for such refusal. (*Ibid.*)

Generally, the hiring of permanent replacement workers to fill openings created by economic strikers, as compared to ULP strikers who are entitled to immediate reinstatement at the expense of replacement workers, is considered a legitimate business justification for refusing to hire back those strikers, in view of "the employer's interest in continuing [its] business during an economic strike, coupled with the necessity of offering the inducement of permanent employment to secure employees willing to violate a picket line." (*International Ass'n of M. & A. W., Dist. No. 8* v. *J. L. Clark Co.* (7th Cir. 1972) 471 F.2d 694, 696.) If an employer has permanently filled the positions held by economic strikers before receiving the strikers' unconditional offers to return to work, the strikers are only entitled to reinstatement as jobs become available. (See *Labor Board* v. *Mackay Co.* [1938] 304 U.S. 333, 345-346 [82 L.Ed. 1381, 1389-1390, 58 S.Ct. 904].) If, however, the strikers have not been permanently replaced at the time the offers are received, they are entitled to immediate reinstatement. (*NLRB* v. *International Van Lines* (1972) 409 U.S. 48, 50 [34 L.Ed.2d 201, 204, 93 S.Ct. 74].)

■ Replacements will be deemed permanent if the employer can "show that the men [and women] who replaced the [economic] strikers were regarded by themselves and the [employer] as having received their jobs on a permanent basis." (*Georgia Highway Express* (June 19, 1967) 165 NLRB 514, 516, affd. *sub nom. Truck Drivers and Helpers Local No. 728* v. *N.L.R.B.* (D.C. Cir. 1968) 403 F.2d 921 [131 App.D.C. 195], cert. den. (1968) 393 U.S. 935 [21 L.Ed.2d 272, 89 S.Ct. 296].) The burden of proving the replacements were hired as permanent employees is on the employer (*NLRB* v. *Fleetwood Trailer Co., supra,* 389 U.S. 375, 378; *NLRB* v. *Great Dane Trailers* (1967) 388 U.S. 26, 34 [18 L.Ed.2d 1027, 1035, 87 S.Ct. 1792]), and the employer must show a mutual understanding between itself

and the replacements that they are permanent. (See *Sam Andrews' Sons* (Dec. 22, 1986) 12 ALRB No. 30, pp. 14-16; *Associated Grocers* (Oct. 14, 1980) 253 NLRB 31, 32, enforced in *Transport and Local Delivery Drivers Local 104* v. *N.L.R.B.* (D.C.Cir. 1981) 672 F.2d 897, cert. den., *Associated Grocers* v. *NLRB* (1982) 459 U.S. 825 [74 L.Ed.2d 61, 103 S.Ct. 57].) The key factor for this showing is whether the employer communicated its intentions to the replacement workers. (See *N.L.R.B.* v. *Murray Products, Inc.* (9th Cir. 1978) 584 F.2d 934, 939.) Without such proof, refusal to rehire strikers after a strike or receipt of their unconditional offers constitutes an unfair labor practice despite the absence of bad faith or anti-union animus, as such a refusal "discourage[s] employees from exercising their rights to organize and to strike guaranteed by §§ 7 and 13 of the [N.L.R.A.] (. . . 29 U.S.C. §§ 157 and 163)." (*NLRB* v. *Fleetwood Trailer Co., supra,* 389 U.S. at p. 378 [19 L.Ed.2d at p. 617].)

■ Further, the determination whether the employer has carried its burden of proof is committed to the Board as the ultimate fact finder entrusted with the sensitive responsibility of balancing rights in labor/management conflicts. (*Labor Board* v. *Erie Resistor Corp.* (1963) 373 U.S. 221, 229 [10 L.Ed.2d 308, 83 S.Ct. 1139, 94 A.L.R.2d 1147].) "It is the primary responsibility of the Board and not of the courts 'to strike the proper balance between the asserted business justifications and the invasion of employee rights in light of the [N.L.R.A.] and its policy.'" (*NLRB* v. *Fleetwood Trailer Co., supra,* 389 U.S. at p. 378 [19 L.Ed.2d at p. 617-618], quoting from *NLRB* v. *Great Dane Trailers, supra,* 388 U.S. at pp. 33-34 [18 L.Ed.2d at p. 1035].) We will not "reject the Board's choice between two fairly conflicting views of the evidence" unless we cannot "conscientiously find that the evidence supporting that decision is substantial." (*N.L.R.B.* v. *W. C. McQuaide, Inc.* (3d Cir. 1977) 552 F.2d. 519, 529, quoting in part from *Universal Camera Corp.* v. *Labor Bd., supra,* 340 U.S. 474, 488 [95 L.Ed. 456, 467-468].)

■ Here, the Board found Vessey failed to adduce evidence to show the replacement employees it hired understood they had been hired as permanent employees. Substantial evidence in the record supports this finding and such finding comports with applicable federal and state law.

Jon Vessey testified it was his understanding the replacements were hired as permanent employees. While this evidence was uncontradicted, it did not meet the initial burden of showing the replacement workers Vessey hired understood they had been hired as permanent employees. Nothing in the record indicates Jon communicated to the replacements his subjective belief they were permanent. Under these circumstances, a unilateral, undisclosed

belief by Jon is inadequate to satisfy the requisite burden of proving the replacement workers held a mutual belief that they were permanent employees. (*Sam Andrews' Sons, supra,* 12 ALRB No. 30, pp. 14-16.) Thus the Board, applying the appropriate law, determined the replacements were not permanent and the strikers were entitled to immediate reinstatement.

That the ALJ found the tractor drivers and irrigators permanent does not negate the substantial evidence supporting the Board's finding. As noted earlier, the ALJ findings are merely part of the record we review along with the other evidence when determining whether substantial evidence supports the Board's findings. (*Abatti Farms, Inc.* v. *Agricultural Labor Relations Bd., supra,* 107 Cal.App.3d at p. 336.) The Board in this case used different legal reasoning than the ALJ in making its factual determination about the permanence of the replacement workers. The Board, not the ALJ, is the statutory finder of fact. (*Andrews* v. *Agricultural Labor Relations Bd.* (1981) 28 Cal.3d 781, 794 [171 Cal.Rptr. 590, 623 P.2d 151].) Because the Board's finding is supported by the record and the applicable law, we do not reject its ultimate determination even in the face of the ALJ's contrary findings. (See *N.L.R.B.* v. *W. C. McQuaide, Inc., supra,* 552 F.2d at p. 529.)

Nor need we discuss whether Vessey's employees were seasonal or year-round and the applicability of *Seabreeze Berry Farms* (1981) 7 ALRB No. 40 to Vessey's case. As we shall discuss more fully in regards to Maggio, on the issue of permanence, *Seabreeze Berry Farms* is contrary to NLRB precedent and has not been followed by the ALRB in subsequent decisions since *Sam Andrews' Sons, supra,* 12 ALRB No. 30, which declined to follow *Seabreeze Berry Farms,* was decided in 1986. (*Id.* at p. 21, fn. 17.) We, therefore, decline to explore its applicability as to Vessey. Moreover, the issue whether an employee is seasonal or year-round is only pertinent after a finding of permanence is made and then only for determining whether vacancies existed for reinstatement purposes. Having found substantial evidence supports the Board's finding Vessey's replacements were not permanent, the fact of seasonal versus year-round employees is irrelevant.

## D. Reversal of ALJ Findings

 Related to its permanency contention, Vessey objects to the Board's reversal of the ALJ's finding it had lawfully refused to immediately reinstate striking tractor drivers and irrigators. Vessey contends the Board cannot reverse the ALJ's finding because it violates California Code of Regulations, title 8, section 20286, a section of the Board's own administrative rules, which provides that an ALJ decision becomes pro forma the Board's decision if no exceptions are filed within 20 days after the ALJ

decision is served on the parties. Because no specific exception was taken as to the status of the tractor drivers and irrigators, Vessey argues the ALJ finding they were permanent should have been left intact. (See *N.L.R.B.* v. *Laborers Intern. U. of North America* (8th Cir. 1977) 567 F.2d 833, 835, fn. 3.)

The ALRB does not directly dispute this issue. The UFW, however, correctly notes the Board is not always bound by the ALJ's findings even without specific exceptions being filed on those findings. We shall explain.

California Code of Regulations, title 8, section 20286, provides in pertinent part: "(a) If no exceptions are filed, the *decision* of the administrative law [judge] shall automatically become final 20 days after the date on which the *decision* of the administrative law [judge] is served on the parties. Unless expressly adopted by the Board, the statement of reasons in support of the *decision* shall be without precedent for future cases.

"(b) Where one or more parties take exception to the decision of the administrative law [judge], the Board shall review the applicable law and the evidence and determine whether the factual findings are supported by a preponderance of the evidence taken." (Italics added.) Once an exception is filed to an ALJ's decision, the Board is statutorily responsible for making factual determinations upon an independent review of the entire record. (§ 1160.3; *Lindeleaf* v. *Agricultural Labor Relations Bd.* (1986) 41 Cal.3d 861, 873 [226 Cal.Rptr. 119, 718 P.2d 106]; *Andrews* v. *Agricultural Labor Relations Bd., supra,* 28 Cal.3d at p. 794.) Thus, as the ultimate fact finder, the Board is free to make its findings contrary to those of the ALJ based on its own views on the weight or credibility of the evidence. That it did here. Such comported with the express language of its administrative regulations enacted to implement its statutory duty under the Act. (§ 1160.3.)

The NLRB authority cited by Vessey is inapposite here. Unlike the ALRB, the NLRB has enacted a specific regulation to assist in carrying out the requirements of the NLRA which states: "No matter not included in a statement of exceptions may thereafter be urged before the Board, or in any further proceedings." (29 C.F.R. § 102.46 (1988).) Contrarily, California Code of Regulations, title 8, section 20286, only requires an exception be made to the ALJ's decision before the Board makes an independent review of the record and not to each finding. Such an exception to the ALJ's decision was made in this case; thus the Board was not bound by the ALJ's factual findings.

Moreover, even applying federal law here, we reach the same conclusion. The federal courts have interpreted 29 Code of Federal Regulations, section

102.46, as only foreclosing the NLRB from addressing an issue and changing a factual determination from which no exception was made where the resolution does not involve different reasoning or due process violations. (See *N.L.R.B.* v. *Local 345, Broth. of Utility Wkrs., etc.* (1st Cir. 1980) 612 F.2d 598, 604; *N.L.R.B.* v. *WTVJ, Inc.* (5th Cir. 1959) 268 F.2d 346, 348.) If resolution of the matter involves different reasoning, then the NLRB is not bound by the determination of the "Trial Examiner." (*N.L.R.B.* v. *WTVJ, Inc., supra,* 268 F.2d at p. 348.) In such a situation, "[e]ven absent an exception, the [NLRB] is not compelled to act as a mere rubber stamp for its Examiner." (*Ibid.*)

Here, after the exceptions to the ALJ's decision were filed, the Board, using different reasoning than the ALJ, made its own findings as to the permanent nature of Vessey's replacements. Vessey did not then timely move for reopening or reconsideration of the Board's decision on grounds of "extraordinary circumstances." As noted in *Nish Noroian Farms* v. *Agricultural Labor Relations Bd.* (1984) 35 Cal.3d 726 [201 Cal.Rptr. 1, 677 P.2d 1170], unless the aggrieved party does so, it cannot thereafter complain of a denial of fair procedure because of the Board's use of different reasoning. (*Id.* at p. 742, citing Cal. Code Regs., tit. 8, § 20286, subd. (c).) Thus, even under federal law, the Board was not bound by the ALJ's findings. (*N.L.R.B.* v. *WTVJ, Inc., supra,* 268 F.2d at p. 348.)

E. DISCRIMINATORY REHIRE AND RECALL

Unlike in Vessey's situation, the Board found Maggio had hired permanent replacements before its economic strikers unconditionally offered to return to work. However, in agreement with the factual findings of the ALJ that Maggio "altered its established seniority practices, imposing new hiring and recall policies designed to limit reemployment opportunities of returning strikers," but "on the basis of reasoning different from that expressed by the ALJ," the Board also found Maggio had deprived those returning strikers full and immediate reinstatement due solely to its altered, discriminatory seniority system.

Maggio now challenges the Board's finding it discriminated against the returning strikers. It claims it had sufficient business reasons for not rehiring the strikers, no evidence was presented to show there were new positions or vacancies which could have been offered to the strikers, the petitioning strikers failed to show continuing availability for reinstatement, the carrot workers failed to keep current addresses on file with the company, and the Board incorrectly applied the law to the existing facts. As we explain below,

none of these claims defeats the Board's finding Maggio discriminated against the returning strikers.

## 1. BUSINESS REASONS

Maggio submits the evidence shows that until the strike, it operated under a collective bargaining agreement which created seniority rights in its "seasonal workers." Because of the strike, and for business reasons, some of the striking workers' jobs were eliminated and the company adopted new policies for seniority, hiring and recall. After receiving the strikers' offers to return to work, it placed them on a preferential hiring list so that it might fill available positions before new hires. No vacancies arose.

 From this evidence, Maggio argues it lawfully altered its seniority, hiring and recall policies in light of the strike; the changes in policies were necessary to ensure a steady work force to continue production during the strike and the permanent replacement workers hired had priority in recall from any seasonal layoff. (See *NLRB* v. *Fleetwood Trailer, supra,* 389 U.S. 375; *Giddings & Lewis, Inc.* v. *N.L.R.B.* (7th Cir. 1982) 675 F.2d 926.) Maggio claims its new policies did not discriminate against strikers who petitioned to return to work; the policies merely allowed the chance the strikers would permanently be replaced or their jobs would be eliminated before any offers to return to work were received. (See *N.L.R.B.* v. *Southern Florida Hotel* (11th Cir. 1985) 751 F.2d 1571, 1583, where court held no unfair labor practice to eliminate one department and permanently reassign non-striking workers to new positions when done so for bona fide reason.)

Citing *Giddings & Lewis, Inc.* v. *N.L.R.B., supra,* 675 F.2d 926, Maggio asserts it had the right to recall from seasonal layoff its permanent replacements before recalling strikers who offered to return to work. (*Id.* at pp. 927-930.) Maggio argues priority for members of its present work force should be recognized and it, like the employer in *Giddings,* should not be forced to prefer a striker to its permanent replacements.

While the legal issues presented here and in *Giddings* are similar, the facts are entirely different. *Giddings* held the new seniority system in that case was a proper business reason which did not discriminate against the returning economic strikers. In *Giddings,* the court was confronted with the issue whether unreinstated economic strikers have a right to reinstatement before the recall of laid-off permanent replacements with less seniority. The employer's justification for enacting the new seniority system preferring the replacements was the preservation of its current work. The NLRB held that giving preference to the replacements regardless of the length or cause of

their layoffs was illegal discrimination against the strikers. (*Giddings & Lewis, Inc.* (Apr. 8, 1981) 255 NLRB No. 93.) The Seventh Circuit Court of Appeals reversed, "holding that because layoffs do not terminate the employment relationship, they do not create vacancies to which strikers are entitled to return. The Seventh Circuit viewed the employer's practice simply as a mechanism to assure permanence to permanent replacements, permissible under *Mackay Radio.*" (*Randall, Div. of Textron, Inc.* v. *N.L.R.B.* (8th Cir. 1982) 687 F.2d 1240, 1246-1247.)

*Mackay Radio* had established for the first time in labor law history the power of an employer "to replace the striking employees with others in an effort to carry on the business." (*Labor Board* v. *Mackay Co., supra,* 304 U.S. 333, 345 [82 L.Ed. 1381, 1389].) *Mackay Radio* further established that the assurances by an employer to those who accepted employment during the strike that they would be permanent if they so desired was not an unfair labor practice nor was it such to reinstate only so many of the strikers as there were vacant positions available. (*Id.* at pp. 345-346 [82 L.Ed. 1389-1390].)

Consistent with *Mackay Radio,* the replacements in *Giddings* were given a definite expectation of recall in the new written seniority rules. (*Giddings & Lewis, Inc.* v. *N.L.R.B., supra,* 675 F.2d at p. 930.) Those new rules did not discriminate against a striker once he or she reentered the workforce; the reinstated strikers received full credit for their pre-strike seniority (*id.* at p. 927, fn. 3) and the rules merely classified all company workers according to whether they were in the work force at the time of a layoff. The circuit court, therefore, found the reinstated strikers were treated no differently than the replacements under the new rules.

Here, however, the evidence shows Maggio not only altered its seniority policies for purposes of hiring and recall of workers, but it also failed to apply those policies fairly. As *Giddings* teaches, the adoption of a new seniority policy for legitimate business reasons is not per se an unfair labor practice which discriminates against union members. (*Giddings & Lewis, Inc.* v. *N.L.R.B., supra,* 675 F.2d 926.) The real issue then becomes whether the conduct of Maggio in applying its new seniority, hiring and recall policies discriminated against the strikers. Substantial evidence in the record shows that it did and, therefore, supports the Board's conclusion Maggio violated section 1153(c) and (a).

■■■■ Generally, in order to prove a prima facie case of discrimination in employment under section 1153(c) and (a), the general counsel mu. ' show the workers engaged in union activities, with the Board's employer's

knowledge, and that there was a causal connection between those activities and the employer's ultimate conduct which is claimed to be discriminatory. (*D'Arrigo Brothers Company, Inc.* (May 25, 1983) 9 ALRB No. 30, p. 9.) Once a prima facie case is established, the employer may avoid liability by proving, by a preponderance of the evidence, that its actions were consistent with past business practices and that it would have taken the same action even in the absence of the union activities. (*Ibid.,* citing *Wright Line, Inc.* (Aug. 27, 1980) 251 NLRB 1083 [enforced *N.L.R.B.* v. *Wright Line, a Div. of Wright Line* (1st Cir. 1981) 662 F.2d 899, cert. den. (1982) 455 U.S. 989 (71 L.Ed.2d 848, 102 S.Ct. 1612)].)

As this court stated in *Kawano, Inc.* v. *Agricultural Labor Relations Bd., supra,* 106 Cal.App.3d 937, 943, a case claiming discrimination based on the refusal to rehire certain workers: "The elements of proof of an unfair refusal to rehire charge are the employee applied for an available position for which he [or she] was qualified and was unequivocally rejected, primarily because of union support. [Citations.] Proof of general company antiunion animus aids general counsel's burden of proof but is not in itself sufficient to prove the charge. [Citations.]" Where the evidence indicates an employer was motivated by both an antiunion bias and legitimate business interests in its challenged action, the so-called "dual motive" situation arises. (See *Martori Brothers Distributors* v. *Agricultural Labor Relations Bd., supra,* 29 Cal.3d 721, 729-730.) If the general counsel or employee has proved a prima facie case of unlawful motive for the employer's action, the burden shifts to the employer to show that the action would have been taken in any event. (*Id.* at p. 730.) If the employer establishes good reasons, it will not be charged with any discriminatory misconduct unless its action would not have been taken "but for" the improper motivation. (*Ibid.*; see also *Kawano, Inc.* v. *Agricultural Labor Relations Bd., supra,* 106 Cal.App.3d at p. 952.)

Here, unlike in *Giddings,* there is evidence in the record the strikers, even when rehired, did not reattain their original seniority date, but were treated as new hires with a new seniority date. This practice clearly discriminated against the returning strikers.

Additionally, though Maggio executives testified the strikers were put on a preferential hiring list, testimony from Maggio foremen and its payroll clerk shows Maggio failed to treat applications from returning strikers in a preferential fashion. None of the foremen was given the list of strikers for the purpose of filling any vacancies and payroll was told to keep the list of strikers separate from other employees. The so-called new seniority policy was not written and deviated from past practice at the company. Moreover,

Carl testified, and numerous foremen corroborated his testimony, that he told the foremen not to hire returning strikers. Instead, Carl only wanted reliable workers, ones who did not strike.

From this evidence, it can reasonably be inferred that Maggio harbored an anti-union bias when it enacted its new seniority system, which was contrary to company policies as established in the recently expired collective bargaining agreement, and applied it in such a fashion to discriminate against returning strikers. (See *Rivcom Corp.* v. *Agricultural Labor Relations Bd., supra,* 34 Cal.3d 743, 757.)

## 2. EVIDENCE OF VACANCIES

 Maggio also contends there is no evidence in the record to show it had any vacancies in which returning strikers would have priority over its replacement workers. It specifically claims there is no evidence it deliberately failed to fill open positions or that there was a shortage of workers on any crews during the 1980-1981 season. It argues it need not reinstate a striker at a different location than where that striker originally worked before the strike unless the striker specifically requests reinstatement at that other location and part-time employees do not hold positions for which strikers should be hired; any inference there were openings created by students, holiday workers or other part-time workers leaving Maggio's employ is invalid.

Because business activities in an agricultural setting fluctuate and it is strictly a matter of business judgment as to how many workers in any crew are required to get a job done, Maggio argues it is difficult to determine at any particular time how many positions are available. Maggio thus claims the Board has failed to meet its burden of proving any vacancies existed for the strikers requesting to return to work. Rather, Maggio contends substantial evidence supports its own position there were no vacancies and it did not discriminate against the strikers. Maggio's contentions have no merit.

Here the evidence before the Board was conflicting. In addition, a difficult problem of proof existed because of the informality of agricultural hiring practices whereby formal hiring commitments did not take place until the first day of the season. Under these circumstances, we are reminded that the ALRB is the body the Legislature chose to initially interpret the Act and we are to give great weight to areas within the Board's specialized knowledge and expertness. (*Tex-Cal Land Management, Inc.* v. *Agricultural Labor Relations Bd., supra,* 24 Cal.3d 335, 346.) We, therefore, do not reweigh the conflicting evidence and must uphold the Board's conclusions if

supported by substantial evidence based on the entire record. (*Martori Brothers Distributors* v. *Agricultural Labor Relations Bd., supra,* 29 Cal.3d at p. 727.) In addition, we must abide by the Board's derivative inferences unless they are drawn from discredited testimony and are irrational, tenuous or unwarranted. (See *Kawano, Inc.* v. *Agricultural Relations Bd., supra,* 106 Cal.App.3d 937.)

In support of Maggio's position there were no vacancies, Maggio executives testified it hired reliable employees of the 1979-1980 crews for the new season. They also stated priority for the Imperial Valley/King City carrot bunch workers was based on a long-standing policy of encouraging workers at both locations to engage in year-round employment by working both harvests. Maggio noted some of the strikers even returned to work in King City in the summer of 1980. Maggio also stated it did not limit its offer of employment to only workers of a certain degree of seniority or state that first-year employees were exempted from the offer of employment in the other location. While it did recall permanent replacements first at the beginning of the next season, between seasons it did not have any vacancies.

 Other testimony, however, shows Maggio resorted to having existing crews increase their hours of work to mask openings and to cutting orders for produce so it would not have to fill openings with strikers. Maggio's broccoli foreman Kirkpatrick testified that after the strike Maggio used only one harvesting crew rather than two which it had used before the strike, and that, even though he needed more harvesting crews, he was told to recall only people who were on lists who worked the previous season or for Maggio in another place or capacity the previous season. He was ordered not to hire strikers. Another broccoli foreman had so much difficulty in filling his crew under these instructions, he resorted to a fraudulent scheme to hire new workers using names of nonstriking Maggio employees who had not returned that season.

Likewise, the carrot crew foreman for Imperial Valley/King City was not given a list of the returning strikers and was instructed to only hire people on lists given him which did not include any of the strikers' names. The weed and thin and sprinkler crews were also cut in size after the strike.

Testimony was adduced that the normal hiring practice for the carrot workers in the past six years was that all seniority workers were able to be employed. The work crews expanded or contracted depending on the number of workers who showed up on any given day in the season.

Moreover, it had been Maggio's past policy, as evidenced by the earlier collective bargaining agreement to not permit transfers between job

classifications and to maintain seniority within each job classification. Thus Maggio's practice under the new system started after the strike which allowed King City carrot workers to have seniority over strikers in the Imperial Valley carrot crew, if those workers wanted to work in Imperial Valley, was contrary to earlier practice and the collective bargaining agreement. Maggio's argument here it should not have to reinstate a striker at a different location from where the striker worked prestrike impeaches its own testimony and position such practice was long-standing and year-round employment had always been encouraged.

Contrary to Maggio's reliance on authority to allow it to rehire permanent employees before strikers after a layoff between seasons, the vacancies evidenced before the Board resulted from either the replacement employees not coming back to work that next season or during the season and the crew thereby being decreased or Maggio having an insufficient number of persons available to perform the particular jobs for each crew and telling its foremen to keep the positions open and work longer hours. Such is sufficient evidence to support a finding that vacancies in fact occurred for which strikers were not hired. Such additionally supports the Board's finding Maggio employed a system of hiring and recall to discriminate against the returning strikers.

## 3. AVAILABILITY AND CURRENT ADDRESSES*

· · · · · · · · · · · · · · · · · · · ·

## 4. SEABREEZE BERRY FARMS

In *Seabreeze Berry Farms, supra,* 7 ALRB No. 40, the Board, in facing the issue of reinstatement rights of economic strikers, weighed "the employer's interest in continuing to do business during an economic strike against the employees' section 1152 rights to engage in concerted activity, evaluating the consequences of the employer's conduct on employee rights in light of the policies of the Act." (*Id.* at p. 3.) It determined: "[f]or the season during which the employees go on strike . . . we shall accept an employer's characterization of its replacement workers as 'permanent' and we shall not require the employer to prove that such offers of employment were necessary in order to induce applicants to accept employment as strike-replacements. [Citation.] [¶]We find, however, that different conditions prevail with respect to subsequent seasons. . . . Therefore, an employer who

---

* See footnote, *ante,* page 629.

refuses, at the beginning of a subsequent season, to rehire former economic strikers who have made an unconditional offer to return to work will be found in violation of section 1153(c) and (a) of the Act unless the employer can demonstrate that at the time when replacement workers were hired during the strike, it was necessary to offer the replacement workers employment which would continue in the following season." (*Id.* at pp. 9-10.)

*Seabreeze* had involved a strike by workers for better wages during a strawberry harvest. Some of the economic strikers had unconditionally offered to return to work during that same season and the company refused to reinstate them. The ALJ in reviewing that decision found the seasonal nature of the agricultural industry required a modification of the NLRB's rule concerning reinstatement rights of economic strikers. Such modification would allow the employer's word to be proof of the permanence of a replacement worker when hired to finish the season in which the strike commenced and then would require the employer to inform the strikers they had preference for vacancies in the immediate season and priority of hire in the following season.

The Board in making its above determination adopted much of the ALJ's reasoning. It further stated it was basing its ruling regarding the season of the strike on NLRB precedent which accepted the employer's characterization of replacement workers as permanent, but because of the seasonal nature of agriculture in California, it would not strictly adhere to NLRB precedent in following seasons.

A strong dissent to the majority Board opinion called the rule announced in *Seabreeze* an unwarranted advantage to the workers in seasonal work as compared to those in year-round or industrial work, contrary to the basic goal of balancing the employers' and the employees' rights in labor law. (*Seabreeze Berry Farms, supra,* 7 ALRB No. 40, *supra,* at pp. 15-20.)

At the time the hearing before the ALJ in this case was reopened, the parties requested a chance to further brief the recent *Seabreeze* case. After hearing argument, the ALJ premised most of his findings as to the rights of Maggio's seasonal economic strikers on the *Seabreeze* case. The Board, however, applied more recent ALRB precedent and federal law instead of *Seabreeze.*

Maggio asks us not to apply *Seabreeze* here. It argues the attempt to distinguish legal rights of permanent replacements in seasonal work from those of other replacements has no foundation in the law, seasonal workers do not fall under migratory work patterns which make it easy to replace

employees, and permanent replacements in an agricultural setting have a right and expectation of recall from season to season just as industrial replacement workers expect to return to work after a weekend break or temporary layoff due to shortage of materials.

Maggio additionally objects to *Seabreeze* being applied here because it changes established NLRB law on which employers have justifiably relied in their duty to reinstate striking workers. Therefore, to apply *Seabreeze* which establishes a new, unforeseeable principle of law to analyze the rehire and recall situation in new seasons would violate due process.

Moreover, Maggio contends the record in this case does not lend itself to application of *Seabreeze*. It argues the evidence shows its layoffs were customary in the agricultural industry, that the employer-employee relationship continued from one season to the next. And, because of the renewed emphasis on giving year-round work to those who came to work for the company, there is absolutely no evidence its crews were largely transient or that their makeup varied greatly from year to year. Thus it would be error to apply *Seabreeze* to this case.

While we agree *Seabreeze* should not apply in this case, we use different reasoning than Maggio. The Board in *Seabreeze* incorrectly interpreted NLRB precedent as accepting the employers' word for the permanence of its replacements. As we have earlier discussed, it is well established in federal law that the burden is on the employer to prove the replacements were hired as permanent employees and that the employer must show there was a mutual understanding between itself and the replacements that they were permanent. (*Associated Grocers, supra,* 253 NLRB at p. 32; *Georgia Highway Express, supra,* 165 NLRB at p. 516, affd. *sub nom. Truck Drivers and Helpers Local No. 728* v. *N.L. R. B., supra,* 403 F.2d 921, cert. den. (1968) 393 U.S. 935 [21 L.Ed.2d 272, 89 S.Ct. 296].)

 And, although we recognize that differences as expressed in *Seabreeze* between agricultural workers and industrial workers do exist, that the Legislature created the ALRB to deal with the peculiar aspects of seasonal work in agriculture (see section 1156.4; *Nish Noroian Farms* v. *Agricultural Labor Relations Bd., supra,* 35 Cal.3d at p. 744; *Agricultural Labor Relations Bd.* v. *Superior Court* (1976) 16 Cal.3d 392, 416 [128 Cal.Rptr. 183, 546 P.2d 687]) and that we are not required to follow NLRB precedent if that precedent is inapplicable to the case before us or in conflict with our Act (*F & P Growers Assn.* v. *Agricultural Labor Relations Bd.* (1985) 168 Cal.App.3d 667 [214 Cal.Rptr. 355]), we do not find *Seabreeze* an authority to follow here when the Board itself has seen fit not to apply

that portion of *Seabreeze* concerning permanence of replacements in its analysis of economic strikers' rights since the *Sam Andrews' Sons* case was decided in December of 1986. (*Sam Andrews' Sons*, *supra,* 12 ALRB No. 30.) *Sam Andrews' Sons* rather than *Seabreeze* has been used in subsequent cases for discussion of the permanence problem. (See *Sam Andrews Sons'* (Oct. 15, 1987) 13 ALRB No. 15.) Our research has turned up no published court cases which have adopted the holding of *Seabreeze* and we decline to adopt its holding here.

Moreover, as we have discussed earlier in this section, the record in this case does not lend itself to application of *Seabreeze.* The vacancies for which the returning strikers were not hired here resulted from the replacement workers not coming back to work or Maggio having an insufficient number of workers to perform the necessary work and covering up those vacancies, and not from the failure to rehire strikers before permanent replacements the next season.

## 5. SUBSTANTIAL EVIDENCE OF MAGGIO'S DISCRIMINATORY SCHEME

 We conclude substantial evidence supports the Board finding of an unfair labor practice consisting of Maggio's failure to treat the returning strikers' offers to return to work in a nondiscriminatory fashion; that the discriminatory alteration of its hiring and recall policies and established seniority practices designed to limit reemployment opportunities of returning strikers violated the Act.

To recapitulate, that evidence consists of the testimony we have described showing work becoming available from time to time by replacement workers not showing up, from Maggio instructing its foremen not to fill the vacancies from the list of strikers who wanted to return to work, and from payroll records which were entered into evidence showing the hiring of new people under replacement worker names rather than strikers after the offers were received. The totality of the evidence reveals Maggio deliberately ignored the strikers as a source of labor in its fields. Maggio has not carried its burden of proving that but for the strike the altered seniority policy would have been created and applied in the manner it was applied.

## F. APPLICATION OF AQUA-CHEM*

. . . . . . . . . . . . . . . . . . . .

* See footnote, *ante,* page 629.

## G. THE ORDER

The initial order here held Maggio violated section 1153 (c) and (a) of the Act and ordered Maggio to cease its unlawful practices and to make whole its former employees who were denied reinstatement as a result of Maggio's altered seniority system implemented to deprive returning strikers of their full reinstatement rights.

After filing its petition for review with this court, Maggio motioned the Board to reconsider or clarify its decision. Before the record was filed with this court on the petition, the Board denied Maggio's motion but issued an amended order to "avoid any confusion as to the scope of [its] previous Order, and to assist [the] compliance agents in determining when and to whom Maggio incurred an obligation to reinstate. . . ." The Board then found Maggio's replacements permanent and amended its original make-whole order to limit "full and immediate reinstatement to those returning economic strikers who were deprived reinstatement solely due to Maggio's altered, discriminatory seniority system." The Board then clarified in its decision accompanying the amended order that "[r]einstatement and back-pay will not be afforded to returning economic strikers whose seniority proves to be less than that earned by their permanent replacements under Maggio's original seniority system."

Maggio contends the Board's remedial order is vague, uncertain and potentially overbroad. Because the order requires it to reinstate striking workers and pay backpay due, Maggio wants clarification to be able to discern to which workers the order applies.

We note the Board derives its power to make remedial orders in unfair labor practice cases from section 1160.3 which provides in part: "If, upon the preponderance of the testimony taken, the board shall be of the opinion that any person named in the complaint has engaged in or is engaging in any such unfair labor practice, the board shall state its findings of fact and shall issue and cause to be served on such person an order requiring such person to cease and desist from such unfair labor practice, [and] to take affirmative action . . . when the board deems such relief appropriate . . . ."

Both California and federal decisions establish "that because the relation of remedy to policy is peculiarly a matter of administrative competence, the Board must be given relatively free reign in determining which remedy would effectuate policies of the Act. [Citations.]" (*J. R. Norton Co.* v. *Agricultural Labor Relations Bd.* [1987] 192 Cal.App.3d 874, 908 [238

Cal.Rptr. 87].) Generally, the Board's order will stand unless it is shown the order " 'is a patent attempt to achieve ends other than those which can be fairly said to effectuate the policies of the Act.' [Citations.]" (*Carian* v. *Agricultural Labor Relations Bd., supra,* 36 Cal.3d at p. 674.)

Here, Maggio appropriately does not challenge the nature of the remedy because where the Board finds an employer has committed an unfair labor practice, it may order the employer to reinstate, with backpay, the employees who were objects of the discrimination. (Section 1160.3; *Babbitt Engineering & Machinery* v. *Agricultural Labor Relations Bd.* (1984) 152 Cal.App.3d 310, 333 [199 Cal.Rptr. 445].) Thus the type of remedy here ordered is proper.

What Maggio does challenge is the scope of the remedial order. We have not held that the new seniority system by itself necessarily violated the Act, but rather we have held it was the discriminatory conduct of Maggio in applying that system that was a violation. The Board's amended order and accompanying decision is thus potentially overbroad to the extent it suggests Maggio could not under any circumstances implement a new seniority system in a nondiscriminatory manner for legitimate business reasons.

Accordingly, we affirm the Board order in all respects except as to that portion which apparently requires adherence to the old seniority system. Rather, the order should be amended to provide full reinstatement and backpay to those who have been discriminated against by the misapplication of the seniority system when vacancies did occur in the Maggio workforce. Under section 1160.8, this court has the jurisdiction "to make and enter a decree enforcing, modifying and enforcing as so modified, or setting aside in whole or in part, the order of the board." During the compliance hearings (see Cal. Code Regs., tit. 8, § 20290; *Nish Noroian Farms* v. *Agricultural Labor Relations Bd., supra,* 35 Cal.3d at pp. 743-744), the parties shall be permitted to offer evidence as to how many vacancies occurred from time to time for which returning strikers were denied their right to reinstatement, in line with the principles we have set forth in this opinion.

## CONCLUSION

We affirm the Board order as modified in this opinion.

Work, Acting P. J., and Froehlich, J., concurred.

A petition for a rehearing was denied May 19, 1989, and petitioner's application for review by the Supreme Court was denied July 13, 1989.