Filed 2/26/21  City of South Pasadena v. Public Employment etc. CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| CITY OF SOUTH PASADENA, | B304596 |
| Petitioner, | (PERB Dec. No. 2692-M) |
| v. | |
| PUBLIC EMPLOYMENT RELATIONS BOARD, | |
| Respondent; | |
| OWEN CLIFF SNIDER, | |
| Real Party in Interest. | |

ORIGINAL PROCEEDING; petition for writ of mandate. Petition granted in part and denied in part.

Liebert Cassidy Whitmore, T. Oliver Yee, David A. Urban, and Anni Safarloo for Petitioner.

J. Felix De La Torre, Wendi L. Ross, James E. Coffey, and Diana Suarez for Respondent.

McGillivary Steele Elkin, Diana J. Nobile, Matthew D. Purushotham; Bush Gottlieb and Dana S. Martinez for Real Party in Interest.

_____

Petitioner City of Pasadena (the City) terminated real party in interest Owen Cliff Snider for dishonesty from his position at the City's fire department (Department) after he participated in a physically intense eight-mile run while on paid leave for a work-related back injury.  Snider, who was the president of the South Pasadena Firefighters' Association (Association), challenged his termination by filing an unfair practice charge (UPC) with respondent Public Employment Relations Board (PERB).  Snider claimed that the City violated the Meyers-Milias-Brown Act (MMBA) (Gov. Code,[1] § 3500 et seq.) by terminating him in retaliation for attempting to bargain the City's light-duty policy and filing a prior related UPC.  PERB agreed with Snider and ordered the City, among other things, to reinstate Snider, pay Snider back pay, and expunge from the City's records, including Snider's personnel file, the investigative report prepared in connection with this case, the notice of intent to terminate Snider, the notice of his termination, and all references to these documents.

The City filed the instant petition for a writ of extraordinary relief, seeking an order setting aside PERB's decision.  Under the deferential standard that governs our review of PERB's decision, we affirm PERB's finding that the City retaliated against Snider for engaging in activities that were

_____

[1] Undesignated statutory citations are to the Government Code.

2

protected by the MMBA. We, however, conclude that PERB abused its discretion in requiring the City to purge from its files all records of Snider's involvement in the Spartan Race. Accordingly, we modify PERB's order such that the City is no longer required to expunge from its records the investigative report and all references to that report and to the notice of intent to terminate and the notice of termination,[2] and deny the remainder of the City's petition.

## FACTUAL AND PROCEDURAL BACKGROUND[3]

We summarize only those facts that are relevant to this writ proceeding.

1. **Snider's Career as a Firefighter, His Role as President of the Association, and the Origin of His Back Injury**

Snider worked for the City as a firefighter/paramedic from 2004 to 2014 and as an engineer from 2014 until his termination on December 7, 2016. Over the course of Snider's employment with the City, he held various executive roles with the

---

[2] As explained in our Discussion part D, *post*, we do not order modification of the remedial order to the extent it requires expungement of these two notices.

[3] Much of this summary is based on undisputed findings included in PERB's final decision in this matter, including the proposed decision issued by PERB's Administrative Law Judge (ALJ) that was ultimately adopted by the agency. (See Standard of Review, *post* [holding that PERB's findings are afforded a strong presumption of correctness that a writ petitioner bears the burden of rebutting]; cf. *Baxter v. State Teachers' Retirement System* (2017) 18 Cal.App.5th 340, 349, fn. 2 [utilizing the summary of facts provided in the trial court's ruling].)

Association.  In particular, Snider served as president of the Association in 2009 and then again from 2011 until his termination.

In October 2014, Snider injured his back while trying to lift a patient during an emergency call.  Although Snider initially felt well enough to remain on duty, he soon afterwards suffered a severe back spasm that required him to visit the emergency room.  He returned to work approximately one month later, after he had been placed on Injured on Duty (IOD) status (i.e., paid leave for an "on-the-job" injury).  IOD status is the City's terminology for temporary total disability status under Labor Code section 4850.

## 2. Snider's December 2015 Back Injury, the January 30, 2016 Spartan Race, and the City's Initial Response to Snider's Involvement in the Race

During the administrative proceedings, Snider testified that he aggravated his back injury in December 2015 while he was observing a demonstration from another firefighter.  He testified that standing still for extended time periods could cause his back to spasm and that he could not stand up the day after the demonstration.  Snider's supervisor, Captain Chris Szenczi, instructed Snider to see his back doctor to assess his condition.

Snider visited Dr. Costigan,[4] the back specialist he had been seeing ever since he suffered his previous back injury.  During the administrative proceedings, Snider testified that Dr. Costigan told him:  " 'I'll take you off work.  Come back in six weeks.  And when you start to feel better, increase your

---

[4] The parties' briefing and PERB's final decision do not supply the doctor's first name.

exercise.'" Snider provided the paperwork he received from Dr. Costigan to the City, and was placed on IOD status once again. As was the case when Snider previously suffered on-the-job injuries, no one from the City expressly instructed Snider to limit his physical activities or to notify the City if his condition improved before his next appointment with Dr. Costigan, which was scheduled for February 2, 2016.

On Saturday, January 30, 2016, Snider and his wife participated in the Spartan Race, which is an approximately eight-mile run over varied terrain with obstacles. Snider's wife registered both of them for the event in October 2015, before Snider re-injured his back. Snider testified that he initially did not feel as though he could complete the race following his back injury, but eventually felt well enough to resume his regular activities at some point during his leave. After the race, Snider's wife posted photographs of herself from the race on a social media site, none of which featured Snider; Snider himself did not post any photographs from the race. The race sponsor later posted the finishing times for Snider and his wife on his wife's social media account.

On January 31, 2016, Captain Szenczi also participated in the Spartan Race with his wife; at that time, Szenczi was not aware that Snider had participated in the race too. That evening, Captain Szenczi's wife showed him online pictures of Snider's wife at the race, and Captain Szenczi thought that one of those photographs was oriented in an unusual way and suspected that Snider's wife may have intentionally edited Snider's face out of the picture. The next day, Captain Szenczi's wife showed Captain Szenczi the social media postings detailing Snider's race finish time. Captain Szenczi testified that upon seeing the

5

photograph of Snider's wife that Szenczi believed could have been edited and the social media postings displaying Snider's finish time, Szenczi had "an indication that [Snider] may have done" the race, but Szenczi lacked "actual knowledge" that Snider participated in the race.[5]

On Tuesday, February 2, 2016, Captain Szenczi and Deputy Chief Paul Riddle attended a firefighting conference. Captain Szenczi told Deputy Chief Riddle that he suspected

---

[5] In its reply brief, the City claims that Captain Szenczi "had no objective evidence to show that Snider ha[d] participated in the Spartan Race in February 2016" because the investigator's report discussed later in this opinion indicates Captain Szenczi stated that he "could not believe that Snider would participate in the event considering he was off work on a back injury," and that Captain Szenczi thought that "perhaps someone filled in for Snider and used his (Snider's) 'bib' number."

PERB's decision notes that the City offered the investigator's report, without attachments, "for the limited purpose of examining Snider's understanding of the investigator's findings" and that "[i]t was not offered or admitted to establish that the investigator's conclusions were accurate or that any person's statements described in the report w[ere] true." Indeed, the administrative hearing transcript reveals the City offered the report for this limited purpose to avoid Snider's hearsay objection thereto. Because the City does not explain why it should be allowed to offer the report in this writ proceeding for some purpose other than that for which it was admitted during administrative proceedings, we disregard the factual assertions advanced by the City that are solely predicated on the investigative report, including the aforementioned statement Captain Szenczi purportedly made to the investigator. (See Standard of Review, *post* [noting that the petitioner bears the burden of showing that the administrative agency erred].)

Snider had participated in the Spartan Race based upon the photograph and the finishing time he had seen. Captain Szenczi and Deputy Chief Riddle testified that they considered Snider's participation in the race to be a "serious matter" because Snider was on IOD at that time. Yet, neither Captain Szenczi nor Deputy Chief Riddle took any further action regarding Snider's involvement in the Spartan Race at that time.

That same day, Snider went to his scheduled appointment with Dr. Costigan and said that he felt he was able to return to work. Snider delivered the required paperwork from his doctor to the City and returned to active duty. Snider testified that after he returned to work, multiple Department employees appeared to know he had run the race.

On March 2, 2016, Captain Szenczi and Snider met to discuss Snider's 2015–2016 performance evaluation. Captain Szenczi gave Snider an overall rating of "excellent," the highest possible score, and ratings of "very good" or "excellent" in almost every category. Captain Szenczi did not mention his belief that Snider participated in the Spartan Race in either the written evaluation or during the meeting. In fact, Captain Szenczi recommended that Snider start training to take the test to promote to the rank of captain. At the hearing, Captain Szenczi claimed that he did not broach the subject of the race because he still lacked "actual knowledge" that Snider had participated in it.

3.   **Snider's Admission to Participating in the Spartan Race and the City's Attempt to Place Snider on Light Duty After He Suffered a Knee Injury**

Around late March or early April 2016, Snider tore the meniscus in his right knee, causing him to be placed on IOD status again. On or about April 27, 2016, Snider received

messages from Department employees stating that Captain Szenczi was telling others that Snider could be fired for participating in the Spartan Race. In late April or early May 2016, Snider called Captain Szenczi, acknowledged running the Spartan Race, and asked Captain Szenczi whether he had told others that doing so would get him fired. Captain Szenczi denied making those comments. Captain Szenczi thereafter reported this conversation to Deputy Chief Riddle, who in turn reported it to Chief Mario Rueda in early May 2016.

In either April or the early part of May 2016, Chief Rueda approached Deputy Chief Riddle about giving Department personnel light-duty assignments while on IOD. Deputy Chief Riddle said that the City has a general light-duty policy, but the Department had not been utilizing it. At the time of this conversation, Snider was the only Department employee on IOD. Sometime after this conversation, Deputy Chief Riddle contacted Snider and directed him to report to the Department for a light-duty assignment. Snider agreed to report for duty but said he wanted to consult with legal counsel because there was no light-duty policy in the negotiated agreement between the City and the Association. While Snider was preparing to return to work, Deputy Chief Riddle called to tell him that he no longer needed to immediately report for duty.

4. **The Association's Bargaining Demands, the UPC Relating Thereto, the City's Investigation into Snider's Participation in the Spartan Race, and the Termination of Snider's Employment**

At Snider's direction, on May 11, 2016, counsel for the Association sent a letter to City Human Resources (HR) Manager Mariam Ko, asserting that the City had no established policy of

8

assigning light duty to employees represented by the Association, and demanded that the City bargain over the negotiable effects of such a policy before implementation. The Association sent a copy of this letter to Deputy Chief Riddle. Ko responded via a letter the following day, asserting that the City's administrative policies have allowed for light-duty assignments since June 16, 1999; copies of her letter were sent to Deputy Chief Riddle and Chief Rueda.

On May 19, 2016, counsel for the Association reasserted its demand to bargain over the effects of assigning light duty to represented employees. Counsel further stated: " 'Should the City continue to fail and refuse to bargain, the Union will be forced to explore all legal avenues to enforce its rights and the rights of its members' "; the Association again sent a copy of this letter to Deputy Chief Riddle.

On May 23, 2016, the City responded via letter, asserting that the decision to give light-duty assignments was not subject to bargaining. Copies of this letter were sent to Deputy Chief Riddle and Chief Rueda. At the time that the City and the Association were exchanging these letters, Ko understood that filing a UPC is one possible legal option to address violations of the duty to bargain in good faith. Snider spoke to Ko directly about the light duty policy at around the same time. When Ko continued to assert that the City would not bargain over the matter, Snider said words to the effect of " 'then I guess we'll leave it up to the attorneys.' "

In or about May 2016, after learning that Snider had run the Spartan Race, Chief Rueda met with Ko to discuss how the City would investigate Snider. On June 5, 2016, in accordance with City protocol for investigations, Ko hired an outside

investigator to determine whether Snider had engaged in misconduct.

On June 9, 2016, at Snider's direction and on behalf of the Association, the Association's legal counsel filed a UPC alleging that the City violated the MMBA by refusing to bargain the effects of its decision to implement a light-duty policy. Ko, Deputy Chief Riddle, and Chief Rueda acknowledged knowing that the Association filed this UPC.

On June 16, 2016, the investigation commenced and the City placed Snider on paid administrative leave. Deputy Chief Riddle testified that he was involved in compiling a list of potential witnesses for the investigator to interview, but that Chief Rueda and Ko made the final determinations as to who should be included on the list. Deputy Chief Riddle testified that the discussions he had with Chief Rueda and Ko regarding the list had focused on interviewing persons from a variety of different ranks in the Department. The investigator interviewed Snider, but did not contact Dr. Costigan or seek Snider's permission to do so.

At some point thereafter, the investigator produced a 35-page report of his findings regarding Snider's conduct.[6] After reviewing that report, Chief Rueda concluded that Snider had engaged in misconduct. Chief Rueda asked Deputy Chief Riddle to provide examples of other instances in which the City had taken corrective action in response to similar misconduct. Deputy Chief Riddle provided three examples of employees who

---

[6] Although PERB admitted the investigator's report for the limited purpose identified in footnote 5, *ante*, there is no dispute as to the authenticity of the report that is included in the administrative record. That report comprises 35 pages.

10

had engaged in dishonesty, but he did not mention a particular firefighter who had misused sick leave in 2015; we discuss that incident in greater detail later in this opinion. Deputy Chief Riddle testified that one of these three instances involved a driving-under-the-influence charge, and Chief Rueda testified that Deputy Chief Riddle claimed that two out of the three incidents resulted in terminations.[7]

On September 29, 2016, the PERB Office of the General Counsel issued a complaint alleging that the City began giving light-duty assignments to Department employees without first affording the Association the opportunity to bargain over the decision and/or the effects of that decision.

On October 3, 2016, Chief Rueda issued Snider a "Notice of Intent to Terminate" that accused Snider of dishonesty, abusing sick leave, violating City policies, and willful acts of bad faith. In particular, the Notice stated that Snider knew he was not supposed to be doing anything physically strenuous while on leave, he failed to notify his supervisors that he felt well enough to return to duty earlier, and he attempted to hide his participation in the race.

---

[7] The City's briefing does not provide any more detail regarding the prior instances of dishonesty discussed by Chief Rueda and Deputy Chief Riddle (e.g., whether the driving under the influence charge case resulted in termination and the nature of the other two instances of dishonesty). The record excerpts the City cites in connection with this issue do not provide any more detail either. " '[W]e have no duty to search the record for [further] evidence' " detailing the prior instances of dishonesty discussed by these two Department officials. (See *Professional Collection Consultants v. Lauron* (2017) 8 Cal.App.5th 958, 974.)

11

In or around November 2016, Snider attended a *Skelly* meeting to discuss the charges against him; Chief Rueda served as the City's officer at that meeting.[8]

The Association withdrew the UPC case regarding the light-duty policy on November 17, 2016, while Snider was on leave pending termination.

After the *Skelly* meeting, Chief Rueda sustained the charges against Snider, and the City issued a "Notice of Termination, Accusation and Statement to Respondent" on December 2, 2016. This Notice largely mirrored the charges and conclusions included in the Notice of Intent to Terminate issued on October 3, 2016. Snider's termination became effective on December 7, 2016. Snider later appealed that decision under the City's appeal process.[9]

---

[8] (See *Chaplin v. State Personnel Bd.* (2020) 54 Cal.App.5th 1104, 1109, fn. 2 ["*Skelly [v. State Personnel Bd.* (1975) 15 Cal.3d 194,] requires that civil service employees be given notice of proposed disciplinary action, the reasons for the action, a copy of the charges and the written materials upon which they are based, and an opportunity to respond either orally or in writing. [Citation.] A '*Skelly* hearing' refers to the employee's opportunity to respond, and it has been described as an 'informal probable-cause-type proceeding.' [Citation.]"].)

[9] As noted in our Discussion part A, *post*, although the City's briefing makes certain representations regarding the course of Snider's appeal of his termination (e.g., the City Manager ultimately denied his appeal), we disregard those representations because they are not supported by evidence in the record before us.

## 5. The Administrative Proceedings Giving Rise to the Instant Writ Petition

On May 26, 2017, Snider filed a UPC in which he claimed that the City terminated his employment in retaliation for demanding that it bargain with the Association before implementing a light-duty policy, and for subsequently filing the UPC relating thereto. On August 22, 2017, the PERB Office of the General Counsel issued a complaint alleging that the City terminated Snider's employment because Snider had filed the UPC concerning the City's light-duty policy.

On January 22 and 23, 2018, ALJ Eric Cu conducted a formal hearing in this matter.

On April 10, 2018, the ALJ issued a proposed decision, wherein he concluded that the City had violated section 3506 and California Code of Regulations, title 8, section 32603, subdivision (a) by terminating Snider's employment in retaliation for his protected activities, to wit, filing and pursuing the prior UPC concerning the light-duty policy and demanding to meet and confer regarding that policy. In particular, the ALJ found that Snider established a prima facie case of retaliation because: (1) The fact that "the City took important steps towards terminating Snider's employment soon after significant developments in either the light duty dispute" or the UPC case relating thereto "strongly support[ed] Snider's retaliation claim"; (2) the ALJ had "reason to doubt" that the City's investigation was "independent and thorough" because the City compiled a list of interviewees for the investigator that "omit[ted] people not employed at the Department who likely had valuable details about Snider's condition and the reasonableness of his actions"; and (3) there was evidence that the City handled Snider's alleged

13

misconduct differently from a firefighter who was not investigated or disciplined even though that firefighter (a) announced in 2015 that he planned on using sick leave whenever he was assigned to a Friday or Saturday shift, and (b) increased his sick leave use significantly afterwards.

The ALJ also concluded that the City had not "met its burden of proving that it would have terminated Snider's employment even if he had not engaged in protected activities" because "[t]he City did not adequately establish that Snider engaged in the misconduct he was accused of, . . . . [and it] also did not adequately explain the suspicious circumstances surrounding this discipline."

The ALJ recommended that PERB issue an order: barring the City from retaliating against Snider because of his protected activities; rescinding Snider's termination and reinstating him with payment for "any financial losses suffered as a direct result of his termination, including back pay, augmented by interest at a rate of 7 percent per annum"; "[e]xpung[ing] from [the City's] records, including Snider's personnel file: (1) the October 3, 2016 Notice of Intent to Terminate[,] . . . (2) the December 2, 2016 Notice of Termination, Accusation and Statement to Respondent[,] (3) the investigative report upon which the above documents were based[,] and (4) all references to those documents"; and requiring the City to post a notice of PERB's order at all work locations where such notices are customarily placed.

On January 30, 2020, PERB adopted the ALJ's proposed decision as its own, and also found that "Snider engaged in protected activity by serving as Association President" and that "the weight of the evidence suggests that Snider's termination

14

was inconsistent with the City's historical use of a progressive discipline policy on both informal and formal levels."

On February 28, 2020, the City timely filed the instant petition for a writ of extraordinary relief, seeking an order directing PERB to set aside and vacate its decision and enter an order dismissing the underlying UPC with prejudice.

## STANDARD OF REVIEW

The procedures governing administrative "writs shall, except where specifically superseded by [the statute governing the review of PERB decisions], apply" to writ proceedings challenging PERB decisions. (See § 3509.5, subd. (b); § 3542, subd. (c) [same].) "In a proceeding on a writ of administrative mandate," the agency's findings are afforded a " 'strong presumption of correctness' " that " 'the party challenging the administrative decision bears the burden' " of rebutting. (See *San Diego Unified School Dist. v. Commission on Professional Competence* (2013) 214 Cal.App.4th 1120, 1140–1141.) Further, "the petitioner, in its petition for writ of review and the supporting points and authorities, has the burden of establishing error in those proceedings, as in cases on appeal from a trial court judgment." (See *Butte View Farms v. Agricultural Labor Relations Bd.* (1979) 95 Cal.App.3d 961, 966, fn. 1 (*Butte View Farms*).)

" 'The findings of [PERB] with respect to questions of fact, including ultimate facts, if supported by substantial evidence on the record considered as a whole, shall be conclusive.' (§ 3509.5, subd. (b).)" (See *Boling v. Public Employment Relations Bd.* (2018) 5 Cal.5th 898, 912 (*Boling I*), fn. omitted.) "[I]n reviewing PERB's findings ' "we do not reweigh the evidence. If there is a plausible basis for [PERB's] factual decisions, we are not

15

concerned that contrary findings may seem to us equally reasonable, or even more so. [Citations.] We will uphold [PERB's] decision if it is supported by substantial evidence on the whole record." ' [Citations.]" (See *ibid.*) Further, "when conflicting inferences may be drawn from undisputed facts, the reviewing court must accept the inference drawn by [PERB] so long as it is reasonable." (See *id.* at p. 913.)

With regard to PERB's legal conclusions, "[i]t is settled that '[c]ourts generally defer to PERB's construction of labor law provisions within its jurisdiction[,]' " including the MMBA. (See *Boling I, supra,* 5 Cal.5th at p. 911.) Thus, "[w]e follow PERB's interpretation [of that statute] unless it is clearly erroneous. [Citation.]" (See *id.* at p. 912.)

Additionally, "[w]e review PERB's remedial orders for abuse of discretion." (*Boling v. Public Employment Relations Bd.* (2019) 33 Cal.App.5th 376, 387 (*Boling II*).)

## DISCUSSION

Under PERB's precedents, an employee can establish a prima facie case of retaliation under section 3506 and California Code of Regulations, title 8, section 32603, subdivision (a), by showing that: "(1) the employee exercised rights under MMBA; (2) the employer had knowledge of the exercise of those rights; (3) the employer took adverse action against the employee; and (4) the employer took the action *because of* the exercise of those rights. [Citations.]" (See *County of Riverside* (2009) PERB Dec. No. 2090-M, p. 25 [34 PERC ¶ 45] (*County of Riverside*), overruled in part on another ground by *Walnut Valley Unified School District* (2016) PERB Dec. No. 2495, pp. 18–19 [41 PERC ¶ 34].)

16

"Once the [employee] establishes a prima facie case of retaliation, the employer then bears the burden of proving that it would have taken the adverse action even if the employee had not engaged in protected activity. [Citations.] Thus, 'the question becomes whether the (adverse action) would not have occurred "but for" the protected activity.' [Citation.] The 'but for' test is 'an affirmative defense which the employer must establish by a preponderance of the evidence.' [Citation.]" (See *County of Riverside*, *supra*, PERB Dec. No. 2090-M, pp. 38–39.)

The City does not contest that Snider established the first three elements of his prima facie case of retaliation. Rather, the City claims he failed to satisfy the fourth element, and that the City should have prevailed on its affirmative defense. The City further contends that even if we reject those appellate claims, we should nonetheless conclude that PERB's remedial order is "overly broad" insofar as it requires the City to expunge from its records the investigative report and any reference to that document and to the disciplinary documents in Snider's personnel file.

For the reasons discussed below, we conclude that substantial evidence on the record considered as a whole supports PERB's finding that Snider established a prima facie case of retaliation, although we disagree with PERB's finding that the investigator's failure to interview certain witnesses suggests the City intended to retaliate against Snider for his protected activities. We also uphold PERB's rejection of the City's affirmative defense.

In contrast, because the undisputed facts demonstrate that Snider did misuse his leave time, we conclude that PERB abused its discretion in issuing a remedial order entirely preventing the

City from considering that misconduct as a basis for discipline. Thus, we modify PERB's decision such that the City is no longer required to expunge from its records the investigative report and all references to that report and to the Notice of Intent to Terminate and the Notice of Termination.

Before turning to these issues, however, we must address certain matters that are outside the record but are nonetheless discussed in the City's briefing.

A.    **We Disregard the City's Arguments Regarding Matters Outside the Administrative Record, Including a Proposed Decision Issued by the Office of Administrative Hearings**

In its opening and reply briefs, the City discusses a proposed decision issued by an ALJ from the Office of Administrative Hearings that addressed Snider's administrative appeal of his termination (OAH decision). For instance, the City argues that "[OAH] ALJ [Thomas] Heller's findings provide substantial evidence regarding the City's reasons for disciplining Snider," and that "ALJ [Heller] found that the timing alone did not prove the investigation was retaliatory and Snider presented no other evidence it was."

The City concedes that the OAH decision is not in the record. PERB's ALJ observed during the proceedings below that although the City mentioned the OAH decision in its closing brief, the City did not request leave to augment the record to include that decision. Had the City made such a request, the OAH decision would, at the very least, have been included in the administrative record as an attachment to the request, regardless of whether PERB's ALJ ultimately granted that request. Furthermore, the City has not supplied us with a copy of the

18

OAH decision or sought judicial notice thereof.  (See Evid. Code, § 452, subd. (c) [providing that a court may take judicial notice of "[o]fficial acts of the legislative, executive, and judicial departments of the United States and of any state of the United States"]; *id.*, § 459, subd. (a) ["The reviewing court may take judicial notice of any matter specified in Section 452."].)

The City readily admits that we may disregard arguments based on matters that are outside the record.  (See *Alki Partners, LP v. DB Fund Services, LLC* (2016) 4 Cal.App.5th 574, 590, fn. 8 ["[C]ourts will decline to consider any factual assertion unsupported by record citation at the point where it is asserted."].)  Yet, the City contends that we should consider its arguments regarding the OAH decision because "indirect references to [the] document's terms" are in the record.  These "indirect references" are simply the descriptions of the OAH decision by Snider's and the City's respective attorneys, and the PERB ALJ's ruling denying Snider's request to file a brief discussing the OAH decision.  These "indirect references" are no better footing than the descriptions thereof included in the City's briefing.  (See *Fierro v. Landry's Restaurant Inc.* (2019) 32 Cal.App.5th 276, 281, fn. 5 [holding that "we are unable to accept counsel's argument on appeal as facts" and that " 'unsworn averments in a memorandum of law prepared by counsel do not constitute evidence' "].)  Furthermore, because we are left with only attorneys' unsworn representations regarding the contents of the OAH decision, we reject the City's claim that reaching the merits of its arguments relating thereto would somehow serve the interests of justice.

Accordingly, we will ignore the City's discussion of the OAH decision.  Because this approach averts any prejudice that PERB

19

and Snider would otherwise suffer as a result of the City's procedurally improper attempt to rely on the OAH decision, we deny as moot PERB's motion to strike the portions of the City's briefing that reference the OAH decision. (See *Matuz v. Gerardin Corp.* (1989) 207 Cal.App.3d 203, 206–207 [denying a motion to strike because the Court of Appeal had elected to simply disregard the passages of the brief that discussed matters outside the record].) For that same reason, we shall not consider the City's unsupported assertions that "the City Manager issued her final opinion upholding the termination of Snider" on April 11, 2018, and that "Snider did not appeal or otherwise challenge this decision."

B.    **Substantial Evidence on the Record Considered as a Whole Supports PERB's Finding that Snider Established a Prima Facie Case of Retaliation**

"Although the timing of the employer's adverse action in close temporal proximity to the employer's protected conduct is an important factor [in assessing whether an employee has established a prima facie case of retaliation] [citation], it does not, without more, demonstrate the necessary connection or 'nexus' between the adverse action and the protected conduct. [Citation.]  Facts establishing one or more of the following factors must also be present: . . . the employer's disparate treatment of the employee [citations]; . . . the employer's cursory investigation of the employee's misconduct [citations]; . . . or . . . any other facts that might demonstrate the employer's unlawful motive. [Citation.]"  (See *County of Riverside, supra*, PERB Dec. No. 2090-M, p. 26.)

As we noted in part 5 of the Factual and Procedural Background, *ante*, PERB found that "[t]he timing of the City's

20

discipline, the City's suspicious investigation practices, and the fact that the City treated Snider's leave abuse claims differently from another similar employee collectively suggest that the City's actions were motivated by Snider's protected activity." The City contests each of these findings.

    *1.    The Record Supports PERB's Finding that the Timing of the City's Important Steps Toward Terminating Snider Is Circumstantial Evidence of the City's Retaliatory Motive*

Although the City does not dispute that "the unfair practice charge as to the light duty assignments coincided with developments in Snider's disciplinary case," the City argues "that is an ineluctable consequence of the two proceedings taking place at the same time" that "cannot serve as the basis for a finding that the timing is 'suspect.'" It seems the City is arguing that PERB should not have considered the timing of these two proceedings in determining whether the City possessed a retaliatory motive. That contention fails because the City makes no effort to show PERB clearly erred in holding that the "close temporal proximity" between an employer's adverse action and its employee's protected activities is "an important factor" to be considered. (See *County of Riverside, supra,* PERB Dec. No. 2090-M, p. 26; *Boling I, supra,* 5 Cal.5th at pp. 911–912 ["We follow PERB's interpretation [of the MMBA] unless it is clearly erroneous."].)

The City further argues that it "was already in the process of assessing and investigating Snider's serious misconduct well before the June 9, 2016 UPC was filed," signifying that Snider's protected activities had no impact on the City's decision to terminate him.

21

In rejecting this contention during the proceedings below, PERB stated: "[T]he City[ ] . . . ignore[s] important contextual details. For instance, the City hired its investigator less than a month after Snider and the Association began asserting that the contemplated light duty policy required negotiations before implementation. The investigation started on June 16, 2016, just one week after the Association filed [the UPC]. The City issued the notice of intent to terminate less than a week from September 29, 2016, when PERB issued its complaint in [the UPC case relating to the light-duty policy]. These facts show that the City took important steps towards terminating Snider's employment soon after significant developments in either the light duty dispute or in [the prior] UPC case . . . ." PERB further stated that these circumstances "strongly support[ ] Snider's retaliation claim."

PERB thus articulated a "plausible basis" for finding that the timing of the City's actions was suspect (see *Boling I*, *supra*, 5 Cal.5th at p. 912), especially given that the City does not challenge PERB's conclusion that Snider's pre-June 9, 2016 attempt to meet and confer regarding the light-duty policy constitutes an activity protected by the MMBA. For this reason, we find that substantial evidence on the record considered as a whole supports the agency's finding that the timing of the City's actions suggests the City possessed a retaliatory motive.

In addition, the City argues that the timing of Chief Rueda's decision to issue a Notice of Intent to Terminate on October 3, 2016 was not suspect because he simply "acted on the information [from the investigator and Deputy Chief Riddle about the City's practices] as it became available." Specifically, the City claims that "Chief Rueda's review of the investigation

22

report and subsequent decision [to issue the Notice of Intent to Terminate] coincided with (as opposed to being in response to) PERB's issuing of the Complaint on September 29, 2016." To support this position, the City claims that Chief Rueda did not personally conduct the investigation or control the schedule for completion of the investigation, and the Chief conferred with Deputy Chief Riddle to determine the "appropriate level of discipline" after the investigator's report became available. Notwithstanding the City's explanation for the timing of the City's October 3, 2016 Notice of Intent to Terminate, we must uphold PERB's finding that the Notice's temporal proximity to the September 29, 2016 complaint supports Snider's prima facie case.[10] (See *Boling I*, *supra*, 5 Cal.5th at p. 912 ["[I]n reviewing PERB's findings ' "we do not reweigh the evidence. If there is a plausible basis for [PERB's] factual decisions, we are not concerned that contrary findings may seem to us equally reasonable, or even more so." ' "].)

Lastly, the City claims that as president of the Association, Snider had "discussed filing prior PERB charges that really 'upset' the City" but he did not claim the City had previously retaliated against him as a result of those charges; "[i]n fact, Snider was promoted during his second term as Association President, even after [an] allegedly contentious [UPC filed] in 2012." PERB suggested in its decision, however, that it instead adopted Snider's interpretation of these facts—i.e., the filing of the UPC concerning the City's light-duty policy "had a negative

---

[10] We also note that although the City claims that Chief Rueda merely "acted on the information as it became available," the City does not specify when Chief Rueda received the investigator's report.

23

impact on relations between the Association and the City because it was the third such charge he authorized during his presidency."  Put differently, the agency tacitly found that Snider's protected activities in the instant case amounted to a coup de grâce.  PERB was entitled to draw that inference.  (See *Boling I*, *supra*, 5 Cal.5th at p. 913 ["[W]hen conflicting inferences may be drawn from undisputed facts, the reviewing court must accept the inference drawn by [PERB] so long as it is reasonable."].)

Accordingly, the City has not shown that PERB erred in finding that the temporal closeness of (a) Snider's protected activities and (b) the investigation and resulting disciplinary proceedings suggested there was a causal connection between them.

> 2. *Although Snider Failed to Establish that the Investigation Was Cursory or Inadequate, the Record Supports PERB's Finding that Other Circumstances Surrounding the Investigation Supported an Inference of Retaliation*

PERB found that although the City hired an outside investigator who prepared a 35-page report of his findings (see fn. 6, *ante*), the City conducted a "cursory investigation" into Snider's conduct before deciding to terminate him, which was "evidence of unlawful motive" on the City's part.  (Underscoring & some capitalization omitted.)  PERB doubted the City's representations that the investigation was "both independent and thorough" because the City's "interviewee selection process only involved finding Department employees of different ranks," and thus "omit[ted] people not employed at the Department who likely had valuable details about Snider's condition and the

24

reasonableness of his actions." In particular, Chief Rueda admitted that "neither the investigator nor the City itself made any attempt to speak with Snider's physician as part of the investigation," and that Snider's medical records were not reviewed as part of the investigation. PERB reasoned that "understanding what activities, if any, Snider's doctors considered appropriate seems to be not only an obvious, but a critical component of the City's investigation."

Although our review is deferential, we do not function as a "rubber stamp" for PERB's decisions.[11] A reasonable factfinder could not have expected the City to investigate whether Dr. Costigan instructed Snider—a man who claimed to have a back injury so serious that at one point he was unable to stand—to engage in any physical activities akin to an approximately eight-mile run through obstacles and over varied terrain. The fact that a doctor had instructed Deputy Chief Riddle to "walk as part of the recovery for his own condition" while he was on IOD status does not detract from this conclusion. It follows that substantial evidence on the record considered as a whole does not support PERB's finding that the City "failed to explore fairly obvious sources in its investigation."

---

[11] (See *Vessey & Co. v. Agricultural Labor Relations Bd.* (1989) 210 Cal.App.3d 629, 642–643 [noting that appellate courts do not function as a "rubber stamp" when applying the same substantial evidence standard that governs our review of PERB's decisions]; *Boling II, supra,* 33 Cal.App.5th at p. 381 & fn. 2 ["In interpreting the [MMBA], courts may look to cases decided under analogous provisions of the federal National Labor Relations Act [citation] and of other California labor relations statutes. [Citations.]"].)

The City argues that Snider told the investigator that he participated in the race to accompany his wife, and that Snider did not tell the investigator that Dr. Costigan recommended that Snider train for the race to improve his back condition. We may not consider this argument because it is predicated on the contents of the investigative report, which was offered "for the limited purpose of examining Snider's understanding of the investigator's findings." (See fn. 5, *ante*.)

In these writ proceedings, PERB attempts to salvage this aspect of its decision by arguing that the private investigator should have interviewed Snider's wife. PERB insists Snider's wife was "an obvious source" of information relating to the City's charge that Snider attempted to hide his participation in the Spartan Race because she "knew that Snider wore a headband during the race that identified him to the public and that he had not instructed her to remove any of the pictures she posted on social media." Because the City did not accuse Snider of refusing to wear an identifying headband or telling his wife to remove any pictures she had posted, it had no reason to interview her on those topics. Rather, the City claimed that Snider told a coworker that he was trying to remove a social media post "depict[ing Snider's] participation in the race." Thus, this potential alternative basis for the agency's finding (i.e., the argument that the investigator should have interviewed Snider's wife) fails.[12] (See *Pack v. Kings County Human Services Agency* (2001) 89 Cal.App.4th 821, 826, fn. 5 (*Pack*) [" 'Although it is the appellant's task to show error, there is a corresponding obligation

_____

[12] Snider also claims that his wife should have been interviewed, but he does not identify any relevant exculpatory information that she would have provided to the investigator.

26

on the part of the respondent to aid the appellate court in sustaining the judgment. "[I]t is as much the duty of the respondent to assist the [appellate] court upon the appeal as it is to properly present a case in the first instance, in the court below." [Citations.]' "].)

Conversely, substantial evidence on the record considered as a whole supports PERB's finding that the City's failure to investigate Snider at an earlier point in time is suspicious. Recall that on February 2, 2016, Captain Szenczi shared with Deputy Chief Riddle his "suspicion that Snider had done the race based on seeing Snider's race time and [a] photo[ ] of [Snider's] wife." PERB observed that even if Captain Szenczi and Deputy Chief Riddle were "uncertain" about Snider's participation in the race when they discussed this issue on February 2, 2016, "they declined to take *any* steps to confirm or refute their suspicions until months later," notwithstanding the fact they both claimed to believe Snider's participation in the race was a "serious" matter.[13] (Italics added.) PERB pointed out that "[n]either person even mentioned the race to [Chief] Rueda until nearly three months later, around the same time the dispute over the light duty issue" arose, and, "[i]n the intervening time period, [Captain] Szenczi even issued Snider a favorable performance

---

[13] Notwithstanding the City's argument to the contrary, PERB's decision does not mean that an "employer should immediately formally investigate rumors that frontline direct supervisors become aware of." Instead, the decision simply establishes that an employer acts suspiciously if it fails to take *any* action when it learns that an employee may have committed serious misconduct (e.g., confronting the employee accused of wrongdoing).

evaluation" that made no mention of the Spartan Race. We agree with PERB that this behavior could suggest that the City did not actually believe "Snider committed serious transgressions," and that its failure to "begin any formal investigation into Snider's conduct until after Snider and the Association demanded to bargain over the effects of the City's light duty policy" was not a mere coincidence.

The City counters that "Snider's misconduct was not brought to Chief Rueda's attention until late-April or early May"; "immediately after learning of the misconduct, he and the City took steps to initiate an investigation"; and "[t]he gap between Chief Rueda and Human Resources Manager Ko learning of Snider's conduct and the commencement of the independent investigation should be the time to be scrutinized with respect to a timeliness concern, if any."

We reject this contention because the City does not cite any authority for the proposition that only such decision-makers' knowledge of a subordinate's misconduct is relevant when determining whether that employee has established a prima face case of retaliation. (See *Butte View Farms*, *supra*, 95 Cal.App.3d at p. 966, fn. 1 ["[T]he petitioner, in its petition for writ of review and the supporting points and authorities, has the burden of establishing error in those proceedings, as in cases on appeal from a trial court judgment."].) Furthermore, PERB found that Deputy Chief Riddle's responsibilities included "advis[ing] the Chief on local policies, practices, and customs" of the Department, and that Chief Rueda consulted with, and "relied heavily on," Deputy Chief Riddle when determining whether to terminate Snider. The City does not explain why, notwithstanding his role in disciplining Snider, Deputy Chief

28

Riddle's awareness of Snider's potential participation in the Spartan Race is immaterial. Consequently, we reject the City's argument that PERB should have focused on only Chief Rueda's and HR Manager Ko's knowledge. (See *Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956 (*Cahill*) [" 'Appellate briefs must provide argument and legal authority for the positions taken. . . . The absence of cogent legal argument or citation to authority allows this court to treat the contention as waived.' "].)

In sum, although we reject PERB's conclusion that the City's investigation was cursory, we agree that other circumstances surrounding the investigation supported Snider's prima facie claim of retaliation.[14]

---

[14] In the course of assessing the City's investigation, PERB remarked that the City's claim that "Snider attempted to hide his participation in the race" was "suspicious because there was little in the record before PERB suggesting that Snider was dishonest about doing the race." While it appears that Snider did not lie to Department personnel about participating in the race, it seems PERB overlooked Captain Szenczi's testimony that Snider admitted to attempting to remove his race finishing time from social media. Regardless of whether this finding is supported by substantial evidence on the record considered as a whole, we would uphold PERB's finding that Snider established a prima facie case of retaliation because the other factors discussed in this opinion collectively constitute a plausible basis for that conclusion.

### 3. The Record Supports PERB's Finding that the City Treated Snider Differently Than Another Similarly Situated Employee

In its decision, PERB found that "the City treated Snider's leave abuse claims differently from another similar employee," which "suggest[ed] that the City's actions were motivated by Snider's protected activity." Specifically, "Snider testified . . . about an employee who in 2015 announced to his crew that he no longer wanted to work on Fridays or Saturdays and that he would call in sick if he was ever assigned to work during one of those shifts. That employee, in fact, began calling in sick more often during those times."[15] "Rather than start an investigation or any disciplinary process, Deputy Chief Riddle spoke to Snider in his capacity as Association President to address the problem." After speaking with Snider, "the employee ceased using his sick leave in that manner . . . ." "There is no evidence that the employee was disciplined and that employee continues to work for the Department."

The City challenges this finding because: (1) It is the product of inadmissible hearsay, (2) it lacked a sufficient evidentiary basis when this other employee's personnel records were not introduced during the administrative proceedings, and (3) Snider and this other employee were not similarly situated where (a) there was no evidence that Deputy Chief Riddle was the decision-maker regarding disciplinary action in 2015, and (b) Snider's misconduct was more egregious than the other

---

[15] PERB noted that "[a]nother Department employee, Daniel Dunn, corroborated Snider's testimony about this employee."

employee's behavior because Snider "committed *possibly* workers compensation fraud." We address each of these contentions seriatim.

California Code of Regulations, title 8, section 32176 provides in pertinent part: "Compliance with the technical rules of evidence applied in the courts shall not be required [in MMBA proceedings before PERB]. . . . Hearsay evidence is admissible but shall not be sufficient in itself to support a finding unless it would be admissible over objection in civil actions. Immaterial, irrelevant, or unduly repetitious evidence may be excluded." (See Cal. Code Regs., tit. 8, § 32176; *id.*, § 32100, subd. (b) [providing that California Code of Regulations, title 8, section 32176 "shall apply to proceedings conducted under MMBA"].)

Although its first argument is not altogether clear, the City apparently contends that the statement from the aforesaid firefighter that he would be taking sick days on Fridays and Saturdays constitutes inadmissible hearsay.[16]

We reject this argument. Evidence Code section 1250, subdivision (a) provides: "Subject to Section 1252,[17] evidence of

---

[16] For the first time in its reply brief, the City suggests that Deputy Chief Riddle's and Snider's conversation regarding this employee is inadmissible hearsay. To the extent the City intended to assert that argument, we reject it as untimely. (*Regency Outdoor Advertising, Inc. v. Carolina Lanes, Inc.* (1995) 31 Cal.App.4th 1323, 1326, 1333 ["To the extent [appellant] raised new arguments either in its reply papers below or in its reply brief on appeal, we do not reach them."].)

[17] "As courts have explained, '[a] statement is trustworthy within the meaning of section 1252 . . . when it is " 'made in a natural manner, and not under circumstances of suspicion. . . .' " '

31

a statement of the declarant's then existing state of mind, emotion, or physical sensation (including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health) is not made inadmissible by the hearsay rule when: [¶] (1) The evidence is offered to prove the declarant's state of mind, emotion, or physical sensation at that time or at any other time when it is itself an issue in the action; or [¶] (2) The evidence is offered to prove or explain acts or conduct of the declarant." (Evid. Code, § 1250, subd. (a).) PERB considered the fellow employee's statement of his intent to call in sick on Fridays and Saturdays if he was ever assigned to work during one of those shifts as evidence that he later acted in a manner consistent with that intent. Thus, the employee's statement of intention was not barred by the hearsay rule.

Next, the City complains that Snider did not introduce personnel records showing that the firefighter in question called in sick on Fridays and Saturdays but was not disciplined, and that "Snider did not testify as to how he had personal knowledge that [the fellow employee] called-in sick."

PERB counters that Snider and Dunn testified that they both worked on the same shift as this employee. Indeed, Snider and Dunn offered testimony that plausibly indicates that they

---

[Citation.]" (*McDermott Ranch, LLC v. Connolly Ranch, Inc.* (2019) 43 Cal.App.5th 549, 560.) Snider's testimony indicates that his fellow employee had an incentive to be truthful when he stated that he would call in sick on Fridays and Saturdays. Specifically, Snider testified that "when you call in sick, since we're such a small Department, that's going to affect somebody else," and that telling other Department personnel that the employee intended to call in sick ensured that others "would know that they might be working on Fridays and Saturdays."

worked on the same shift as this employee and, in any event, the City impliedly conceded that all three employees worked on the same shift by failing to dispute this contention in its reply brief. (See *Rudick v. State Bd. of Optometry* (2019) 41 Cal.App.5th 77, 89–90 [concluding that the appellants made an implicit concession by "failing to respond in their reply brief to the [respondent's] argument on th[at] point"].) Thus, PERB reasonably could have found that Snider and Dunn were both in a position to know whether this employee called in sick on their shift on Fridays and Saturdays after he had declared his intention to do so.[18] (See *People v. Montoya* (2007) 149 Cal.App.4th 1139, 1150 ["To testify, a witness must have personal knowledge of the subject of the testimony, based on *the capacity to perceive* and recollect," italics added].)

With respect to evidence that this employee was not disciplined, PERB found significant the fact that Deputy Chief Riddle did not mention this employee's conduct to Chief Rueda when he had asked Deputy Chief Riddle to identify instances in which the City took action against other personnel for conduct similar to the conduct leading up to Snider's termination. This testimony is consistent with Snider's testimony that Deputy Chief Riddle had asked Snider to resolve this issue with the employee informally. These facts supply a plausible basis for PERB's finding that the City did not discipline the other

---

[18] Snider testified that this employee "started calling in sick on Fridays and Saturdays" after making that statement. Similarly, Dunn testified that this employee "did call off sick a lot after" making that statement, although Dunn indicated he could not recall precisely "what days they were."

33

employee, even though Snider did not introduce the employee's personnel records into evidence.

Furthermore, the City intimates that Snider's testimony that Deputy Chief Riddle asked him to speak with the employee is immaterial because "no evidence was presented that at the time of the alleged . . . misuse-of-sick-leave incident that [Deputy Chief] Riddle was the decision maker regarding disciplinary action." Nonetheless, PERB could have reasonably inferred from Snider's testimony that Deputy Chief Riddle had this conversation with him because the Deputy Chief played a key role in the disciplinary decision-making process, or else he would not have asked Snider to handle the situation. This inference is consistent with PERB's finding that Chief Rueda "relied heavily on [Deputy Chief] Riddle to provide him insight into the past practices, customs, and rule interpretations for the Department . . . . when deciding what penalty to issue Snider." Thus, PERB did not err in considering Deputy Chief Riddle's conduct in the course of determining whether the City treated this employee differently for conduct that was similar to that for which Snider was disciplined.

The City argues that the other firefighter's alleged misconduct was not similar to Snider's purported malfeasance on the ground that the latter amounts to "*possible* workers compensation fraud" because while Snider was on IOD status, he received pay under Labor Code section 4850. Although PERB acknowledged that "the City might justifiably conclude that the two situations warrant different levels of corrective action, [PERB found] it suspicious that the City did not consider the [other] employee's actions to warrant any investigation or discipline at all given that he appeared to admit that he was

34

intentionally misusing his leave." PERB also found that the two "situations [were] similar enough to make some useful comparisons" because "[b]oth matters involve[d] the alleged abuse of leave time and dishonesty."[19] Accordingly, although the circumstances of these two cases were not identical, PERB articulated a plausible basis for finding that the City's decision to investigate and discipline Snider, but not the other employee, gives rise to an inference of an unlawful motive.

Additionally, Snider introduced evidence that on other occasions, the City did not investigate or take any disciplinary action against employees who misused sick leave. Snider testified that Department personnel engaged in a practice involving the so-called "Guiral day," which is "when somebody will take sick days after their vacation to extend their vacation . . . ." Snider testified that during his "time at the Department" and as president of the Association, he was not aware of any instance in which the City investigated or disciplined any employee who took a Guiral day.[20] Dunn corroborated Snider's testimony that Department employees took "Guiral days," and Dunn claimed that: He was unaware of any personnel being investigated or disciplined for engaging in this practice, the practice's use was "common knowledge" within the Department because other employees would need to cover those days, and Battalion Chiefs Pock and Guiral had originated the

---

[19] In fact, the City likewise characterized Snider's behavior as an "abuse of sick leave" in its October 3, 2016 Notice of Intent to Terminate.

[20] Snider testified that, as president of the Association, he "frequently" interacted with Department managers and supervisors regarding "disciplinary issues for other firefighters."

practice. This evidence further supports PERB's finding that Snider's termination "was disproportionate . . . with the discipline imposed on other employees . . . ."

In sum, substantial evidence on the record considered as a whole supports PERB's findings that (1) the timing of the investigation (i.e., the City took no action until around the time that Snider sought to bargain the light-duty policy, even though Captain Szenczi and Deputy Chief Riddle already suspected Snider participated in the race), (2) the timing of Snider's discipline (i.e., important steps were taken toward terminating Snider after significant developments in the light-duty dispute), and (3) the City's disparate treatment of Snider and other personnel who misused sick leave, give rise to an inference that the City terminated Snider because of his protected activities. Put differently, these factors constitute a plausible basis for finding the City would not have terminated Snider if he had refrained from attempting to bargain the light-duty policy and filing the related UPC. Because PERB could have reasonably drawn this inference even in the absence of a finding that the investigation was cursory, we uphold the agency's determination that Snider established a prima facie case of retaliation. (See *Boling I*, *supra*, 5 Cal.5th at p. 912 [announcing the deferential standard of review applicable to PERB's factual findings].)

C.    **Substantial Evidence on the Record Considered as a Whole Supports PERB's Finding that the City Failed to Show that It Would Have Terminated Snider Even if He Had Not Engaged in Protected Activities**

The City contends that regardless of whether Snider had engaged in activities protected by the MMBA, it would have terminated him because of his "dishonesty, and the negative

36

impact of that dishonesty on the public trust," which the Department must maintain in order "to perform its functions effectively." In support of this contention, the City again claims it was concerned that Snider may have committed workers' compensation fraud. It also contends because "Snider seemed concerned that individuals in the [D]epartment were speaking about his conduct, [citation.] . . . it is clear he was concerned that he now lacked integrity and had lost the trust of the small group of firefighters who make up the [D]epartment."

PERB's finding that the City has not "adequately explain[ed] the suspicious circumstances surrounding [Snider's] discipline" disposes of the City's professed concern that Snider may have committed "criminal dishonesty."[21] This is because the possibility that Snider perpetrated a criminal act did not prevent him from securing a favorable performance review or spur the City even to investigate his participation in the Spartan Race until after Snider engaged in protected conduct. PERB reasonably could have found that this evidence was inconsistent with the City's claims that it considered Snider's conduct to be so

---

[21] We note that although it does not appear that Snider was charged with a crime, his use of IOD status while claiming Labor Code section 4850 benefits when he was not actually injured arguably constitutes an offense. (See Ins. Code, § 1871.4, subd. (a)(1) ["It is unlawful to do any of the following: [¶] . . . Make or cause to be made a knowingly false or fraudulent material statement or material representation for the purpose of obtaining . . . any compensation, as defined in Section 3207 of the Labor Code."]; Ins. Code, § 1871.4, subd. (b) [imposing criminal penalties for violations of subdivision (a)]; Lab. Code, § 3207 [defining "compensation" to include benefits under Labor Code section 4850].)

serious that it would have terminated him even if he had not engaged in protected activities.

Furthermore, PERB could have reasonably inferred that Snider was concerned that Department personnel were discussing his participation in the race not because he thought he had lost these colleagues' trust, but simply because he did not want to be disciplined for his misuse of paid leave. In other words, Snider's conduct does not necessarily establish that he lost the trust of his colleagues such that the City had a reason to terminate Snider independent of his protected activities.

In sum, we conclude that substantial evidence on the record considered as a whole supports PERB's rejection of the City's affirmative defense.

## D. PERB Abused Its Discretion in Ordering the Expungement of (1) the Investigative Report and (2) All References in the City's Records to (a) that Report, (b) the Notice of Intent to Terminate, and (c) the Notice of Termination

Under the abuse of discretion standard, "a 'remedial order [generally] "should stand unless it can be shown that the order is a patent attempt to achieve ends other than those which can be fairly said to effectuate the policies of the [MMBA]." [Citations.]' [Citations.]" (See *Boling II*, *supra*, 33 Cal.App.5th at pp. 381, 387–388.) "PERB's remedial orders may not be punitive," and "they may not encroach upon statutes and policies unrelated to the [MMBA] and, therefore, outside of PERB's competence to administer." (*Id*. at p. 388.) Additionally, we have the authority to "make and enter a decree enforcing, modifying, . . . enforcing as modified, or setting aside in whole or in part the decision or order of [PERB]." (See § 3509.5, subd. (b).)

38

The City contends that even if we were to uphold PERB's conclusion that the City terminated Snider in retaliation for his protected activities, we should modify PERB's remedial order because it is overbroad. Specifically, the City claims that PERB should not have ordered the City to expunge from its records, including Snider's personnel file: (1) the investigative report "upon which" the City's Notice of Intent to Terminate and Notice of Termination "were based," and (2) "all references to those documents." (Boldface omitted.) The City maintains that "Snider himself has admitted to participating in a vigorous physical race while on IOD leave," and expunging Snider's personnel file of any mention of the Spartan Race will hinder the City's ability to ensure that he does not engage in such misconduct again.[22]

---

[22] We note that the City does not appear to argue that the Notice of Intent to Terminate and the Notice of Termination themselves should not be expunged were we to uphold PERB's finding that the City retaliated against Snider for his protected activities. Such a request would be inconsistent with the premise that his termination would have been found to be the product of retaliation. We also note that PERB likewise appears to read the City's argument as a challenge only to PERB's "order requiring that the investigative report and references to the Notice of Intent to Terminate and Notice of Termination be expunged from Snider's personnel file," and Snider also reads the City's opening brief as contesting only "the expungement of the investigative report and other related documents." To the extent the City intended to challenge any other portions of PERB's remedial order (e.g., the order expunging the two aforementioned disciplinary documents), we conclude the City waived any such argument by failing to raise it adequately. (See *Cahill, supra,* 194 Cal.App.4th at p. 956 [" 'The absence of cogent legal

39

We conclude that in its current form, PERB's remedial order "encroach[es] upon [a] statute[ ] and policies unrelated to the [MMBA]." (See *Boling II*, *supra*, 33 Cal.App.5th at p. 388.) There is no dispute that Snider was on IOD status, and therefore reaped the benefits of Labor Code section 4850, at a time when he knew he was ineligible for such injury-related benefits because he was capable of participating in the physically strenuous Spartan Race.[23] Allowing Snider to return to work at the Department without *any* consequence at all—not even the opportunity to consider his behavior when ascertaining a penalty for any future misconduct—would hinder the City from deterring Snider from once again misusing IOD leave. Thus, as it stands, PERB's remedial order interferes with the City's ability to manage its financial obligations under Labor Code section 4850. (See *County of Nevada v. Workers' Comp. Appeals Bd.* (2014) 223 Cal.App.4th

argument or citation to authority allows this court to treat the contention as waived.' "].)

[23] Labor Code section 4850 provides in pertinent part: "Whenever any [city firefighter], who is employed on a regular, full-time basis, and is disabled, whether temporarily or permanently, by injury or illness arising out of and in the course of his or her duties, he or she shall become entitled, regardless of his or her period of service with the city, . . . to a leave of absence *while so disabled* without loss of salary in lieu of temporary disability payments or maintenance allowance payments, if any, that would be payable under this chapter, *for the period of the disability . . . .*" (See Lab. Code, § 4850, subds. (a)–(b), italics added.) Given the plain and unambiguous statutory text and common sense, we reject Snider's assertion that because the City had "no specific rule instructing Department members to inform the [D]epartment if they feel better during IOD leave," he was unaware that participating in the Spartan Race was wrongful.

40

579, 582–584 [indicating that Labor Code section 4850 imposes a financial obligation on a public employer].) Also, given that firefighters routinely enter peoples' private residences to provide assistance in emergencies, the public also has an interest in ensuring that Department employees are held accountable for, and are deterred from engaging in, acts of dishonesty.

Although we uphold PERB's finding that the City's decision to *terminate* Snider was a form of retaliation for the exercise of his rights to bargain over the light-duty policy, our conclusion does not imply that the City could not have subjected Snider to *some form* of discipline without running afoul of the MMBA. Indeed, PERB tacitly conceded this point in its decision by acknowledging that Snider's conduct could be considered more grave than that of the employee who called in sick on Fridays and Saturdays, and that "the City might justifiably conclude that the two situations warrant different levels of corrective action." We fail to discern the logic that allowing the City to document such dishonesty in a personnel file would discourage employees from engaging in protected activity. Accordingly, the expungement from the City's records of any mention of Snider's participation in the Spartan Race while on leave cannot " ' "be fairly said to effectuate the policies of the [MMBA]." [Citations.]' " (See *Boling II*, *supra*, 33 Cal.App.5th at pp. 381, 387–388.)

PERB argues that its "order requiring that the investigative report and references to the Notice of Intent to Terminate and Notice of Termination be expunged from Snider's personnel file is a standard PERB remedy that is in accordance with PERB's precedent." The decisions upon which PERB relies are inapposite.

41

First, PERB notes that "in *County of Riverside*, [citation] [PERB] found that an employer's 'less than thorough investigation' supported an inference of unlawful motivation and ordered the employer to expunge all records of the retaliatory discipline and rescind all of the adverse effects of that discipline." (Citing *County of Riverside, supra,* PERB Dec. No. 2090-M, pp. 40–43.)  In contrast, we have concluded that substantial evidence on the record considered as a whole does not support PERB's finding that the investigation of Snider was "cursory." (See Discussion part B.2, *ante*.)  Furthermore, Snider is not unfairly prejudiced by an order modifying the expungement provision of PERB's decision because, although he may believe that certain findings made by the City or its investigator were unfounded, he had an opportunity to correct the record with evidence of his own at the *Skelly* meeting.  (See fn. 8, *ante*.) Thus, PERB's reliance on *County of Riverside* is unavailing.

Second, PERB points out that in *Capistrano Unified School District*, PERB "ordered that a written reprimand be expunged from an employee's personnel file after her employer denied her right to union representation."  (Citing *Capistrano Unified School District* (2015) PERB Dec. No. 2440, p. 56 [40 PERC ¶ 24] (*Capistrano Unified School District*).)  The remedial order in that case, however, merely expunged the written reprimand, and did not require the employer to purge from its files any and all related documents.  (*Ibid.* [ordering the employer to "[r]escind and expunge from [the employee's] personnel files the September 1, 2011 Written Reprimand issued to [the employee]"].)  Thus, *Capistrano Unified School District* does not

42

demonstrate that the expansive remedial order issued to the City "is in accordance with PERB's precedent."[24]

In conclusion, although PERB did not err in concluding that the City's termination of Snider violated the MMBA, the agency abused its discretion in absolving Snider from suffering any consequences as a result of his participation in the Spartan Race when he was on IOD status. Thus, we modify PERB's order such that the City need not expunge the investigative report and references to that report and the Notice of Intent to Terminate and Notice of Termination, although the latter disciplinary notices themselves must still be expunged.[25]

---

[24] Snider also argues that PERB's decision in *Novato Unified School District* (1982) PERB Dec. No. 210 [6 PERC ¶ 13114], establishes that the expungement of the investigative report and all references to that report and the disciplinary documents is appropriate in this case. Snider makes no effort to analogize the facts of *Novato Unified School District* to the instant case, and he does not even supply any pincites to the portions of that decision that allegedly support his position. Accordingly, we need not consider this argument further. (See *Pack*, *supra*, 89 Cal.App.4th at p. 826, fn. 5 [" 'Although it is the appellant's task to show error, there is a corresponding obligation on the part of the respondent to aid the appellate court in sustaining the judgment.' "].)

[25] Snider does not argue that the City's proposed modification to PERB's remedial order is vague or unclear (e.g., that he cannot discern which references to the disciplinary notices would remain in his personnel file if we grant the City the proposed modification it seeks). Instead, Snider simply argues that "removing from the City's records the documents related to its retaliatory action" is a remedy that "effectuates the purposes of the MMBA . . . ."

## DISPOSITION

We grant the City of South Pasadena's (the City's) petition for a writ of extraordinary relief only insofar as it seeks an order modifying Public Employment Relations Board (PERB) Decision No. 2692-M such that the City is no longer required to expunge from its records, including Owen Cliff Snider's personnel file: (1) the investigative report; and (2) all references to (a) the investigative report, (b) the October 3, 2016 Notice of Intent to Terminate, and (c) the December 2, 2016 Notice of Termination, Accusation and Statement to Respondent. The October 3, 2016 Notice of Intent to Terminate and the December 2, 2016 Notice of Termination, Accusation and Statement to Respondent, however, must still be expunged. We deny the remainder of the City's petition. We deny as moot PERB's motion to strike portions of the City's opening and reply briefs. Each party is to bear its own costs in this review proceeding.

NOT TO BE PUBLISHED.

BENDIX, Acting P. J.

We concur:

CHANEY, J.                    FEDERMAN, J.*

---

* Judge of the San Luis Obispo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.